# BROWN, WARDEN *v.* PAYTON

No. 03–1039.   Argued November 10, 2004—Decided March 22, 2005

KENNEDY, J., delivered the opinion of the Court, in which O'CONNOR, SCALIA, THOMAS, and BREYER, JJ., joined. SCALIA, J., filed a concurring opinion, in which THOMAS, J., joined, *post*, p. 147. BREYER, J., filed a concurring opinion, *post*, p. 148. SOUTER, J., filed a dissenting opinion, in which STEVENS and GINSBURG, JJ., joined, *post*, p. 149. REHNQUIST, C. J., took no part in the decision of the case.

*A. Natalia Cortina,* Deputy Attorney General of California, argued the cause for petitioner. With her on the briefs were *Bill Lockyer,* Attorney General, *Manuel M. Medeiros,* State Solicitor General, *Robert R. Anderson,* Chief Assistant Attorney General, *Gary W. Schons,* Senior Assistant Attorney General, *Steven T. Oetting,* Supervising Deputy Attorney General, and *Melissa A. Mandel,* Deputy Attorney General.

*Dean R. Gits* argued the cause for respondent. With him on the brief were *Maria E. Stratton, Mark R. Drozdowski,* and *Rosalie L. Rakoff.*\*

JUSTICE KENNEDY delivered the opinion of the Court.

The United States Court of Appeals for the Ninth Circuit, convening en banc, granted habeas relief to respondent William Payton. It held that the jury instructions in the penalty phase of his trial for capital murder did not permit consideration of all the mitigation evidence Payton presented. The error, the court determined, was that the general mitigation instruction did not make it clear to the jury that it could consider evidence concerning Payton's post-crime religious conversion and the prosecutor was allowed

---

\**Kent S. Scheidegger* and *Charles L. Hobson* filed a brief for the Criminal Justice Legal Foundation as *amicus curiae* urging reversal.

to urge this erroneous interpretation. We granted the petition for certiorari, 541 U. S. 1062 (2004), to decide whether the Ninth Circuit's decision was contrary to the limits on federal habeas review imposed by 28 U. S. C. § 2254(d). We now reverse.

I

In 1980, while spending the night at a boarding house, Payton raped another boarder, Pamela Montgomery, and then used a butcher knife to stab her to death. Payton proceeded to enter the bedroom of the house's patron, Patricia Pensinger, and to stab her as she slept aside her 10-year-old son, Blaine. When Blaine resisted, Payton started to stab him as well. Payton's knife blade bent, and he went to the kitchen to retrieve another. Upon the intervention of other boarders, Payton dropped the second knife and fled.

Payton was arrested and tried for the first-degree murder and rape of Pamela Montgomery and for the attempted murders of Patricia and Blaine Pensinger. Payton presented no evidence in the guilt phase of the trial and was convicted on all counts. The trial proceeded to the penalty phase, where the prosecutor introduced evidence of a prior incident when Payton stabbed a girlfriend; a prior conviction for rape; a prior drug-related felony conviction; and evidence of jailhouse conversations in which Payton admitted he had an "urge to kill" and a "severe problem with sex and women" that caused him to view all women as potential victims to "stab . . . and rape." *People* v. *Payton,* 3 Cal. 4th 1050, 1058, 839 P. 2d 1035, 1040 (1992) (internal quotation marks omitted).

Defense counsel concentrated on Payton's postcrime behavior and presented evidence from eight witnesses. They testified that in the year and nine months Payton spent in prison since his arrest, he had made a sincere commitment to God, participated in prison Bible study classes and a prison ministry, and had a calming effect on other prisoners.

Before the penalty phase closing arguments, the judge held an in-chambers conference with counsel to discuss jury instructions. He proposed to give—and later did give—an instruction which followed verbatim the text of a California statute. Cal. Penal Code Ann. § 190.3 (West 1988). The instruction set forth 11 different factors, labeled (a) through (k), for the jury to "consider, take into account and be guided by" in determining whether to impose a sentence of life imprisonment or death. 1 Cal. Jury Instr., Crim., No. 8.84.1 (4th rev, ed. 1979).

The in-chambers conference considered in particular the last instruction in the series, the so-called factor (k) instruction. Factor (k) was a catchall instruction, in contrast to the greater specificity of the instructions that preceded it. As set forth in the statute, and as explained to the jury, it directed jurors to consider "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime." Cal. Penal Code Ann. § 190.3 (West 1988). (The statute has since been amended.)

Defense counsel objected to the instruction and asked that it be modified to direct the jury, in more specific terms, to consider evidence of the defendant's character and background. The prosecution, on the other hand, indicated that in its view factor (k) was not intended to encompass evidence concerning a defendant's background or character. The court agreed with defense counsel that factor (k) was a general instruction covering all mitigating evidence. It declined, however, to modify the wording, in part because the instruction repeated the text of the statute. In addition, the court stated: "I assume you gentlemen, as I said, in your argument can certainly relate—relate back to those factors and certainly can argue the defendant's character, background, history, mental condition, physical condition; certainly fall into category 'k' and certainly make a clear argument to the jury." App. 59.

The judge prefaced closing arguments by instructing the jury that what it would hear from counsel was "not evidence but argument" and "[you] should rely on your own recollection of the evidence." *Id.*, at 62. In his closing, the prosecutor offered jurors his opinion that factor (k) did not allow them to consider anything that happened "after the [crime] or later." *Id.*, at 68. The parties do not now dispute that this was a misstatement of law. The defense objected to the comment and moved for a mistrial, which the trial court denied. The court admonished the jury that the prosecutor's comments were merely argument, but it did not explicitly instruct the jury that the prosecutor's interpretation was incorrect. *Id.*, at 69–70.

Although the prosecutor again told the jury several times that, in his view, the jury had not heard any evidence of mitigation, he proceeded to argue that the circumstances and facts of the case, coupled with Payton's prior violent acts, outweighed the mitigating effect of Payton's newfound Christianity. *Id.*, at 70. He discussed the mitigation evidence in considerable detail and concluded by urging that the circumstances of the case and Payton's prior violent acts outweighed his religious conversion. *Id.*, at 75–76. In his closing, defense counsel argued to the jury that, although it might be awkwardly worded, factor (k) was a catchall instruction designed to cover precisely the kind of evidence Payton had presented.

The trial court's final instructions to the jury included the factor (k) instruction, as well as an instruction directing the jury to consider all evidence presented during the trial. *Id.*, at 94. The jury found the special circumstance of murder in the course of committing rape and returned a verdict recommending a death sentence. The judge sentenced Payton to death for murder and to 21 years and 8 months for rape and attempted murder.

On direct appeal to the California Supreme Court, Payton argued that his penalty phase jury incorrectly was led to

believe it could not consider the mitigating evidence of his postconviction conduct in determining whether he should receive a sentence of life imprisonment or death, in violation of the Eighth Amendment of the U. S. Constitution. *Lockett v. Ohio,* 438 U. S. 586, 602–609 (1978) (plurality opinion). The text of the factor (k) instruction, he maintained, was misleading, and rendered more so in light of the prosecutor's argument.

In a 5-to-2 decision, the California Supreme Court rejected Payton's claims and affirmed his convictions and sentence. 3 Cal. 4th 1050, 839 P. 2d 1035 (1992). Applying *Boyde* v. *California,* 494 U. S. 370 (1990), which had considered the constitutionality of the same factor (k) instruction, the state court held that in the context of the proceedings there was no reasonable likelihood that Payton's jury believed it was required to disregard his mitigating evidence. 3 Cal. 4th, at 1070–1071, 839 P. 2d, at 1048. Payton sought review of the California Supreme Court's decision here. We declined to grant certiorari. *Payton* v. *California,* 510 U. S. 1040 (1994).

Payton filed a petition for a writ of habeas corpus in the United States District Court for the Central District of California, reiterating that the jury was prevented from considering his mitigation evidence. The District Court held that the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 110 Stat. 1214, did not apply to Payton's petition because he had filed a motion for appointment of counsel before AEDPA's effective date, even though he did not file the petition until after that date. The District Court considered his claims *de novo* and granted the petition.

On appeal to the Court of Appeals for the Ninth Circuit, a divided panel reversed. *Payton* v. *Woodford,* 258 F. 3d 905 (2001). The Court of Appeals granted Payton's petition for rehearing en banc and, by a 6-to-5 vote, affirmed the District Court's order granting habeas relief. *Payton* v. *Woodford,* 299 F. 3d 815 (2002). The en banc panel, like the District Court, held that AEDPA did not govern Payton's petition.

It, too, conducted a *de novo* review of his claims, and concluded that postcrime mitigation evidence was not encompassed by the factor (k) instruction, a view it found to have been reinforced by the prosecutor's arguments.

The State petitioned for certiorari. Pursuant to *Woodford* v. *Garceau*, 538 U. S. 202 (2003), which held that a request for appointment of counsel did not suffice to make "pending" a habeas petition filed after AEDPA's effective date, we granted the State's petition, *Woodford* v. *Payton*, 538 U. S. 975 (2003), and remanded to the Court of Appeals for reconsideration of its decision under AEDPA's deferential standards. See *Williams* v. *Taylor*, 529 U. S. 362 (2000).

On remand, the en banc panel affirmed the District Court's previous grant of habeas relief by the same 6-to-5 vote. *Payton* v. *Woodford*, 346 F. 3d 1204 (CA9 2003). In light of *Garceau*, the Court of Appeals purported to decide the case under the deferential standard AEDPA mandates. It concluded, however, that the California Supreme Court had unreasonably applied this Court's precedents in holding the factor (k) instruction was not unconstitutionally ambiguous in Payton's case.

The Court of Appeals relied, as it had in its initial decision, on the proposition that *Boyde* concerned precrime, not postcrime, mitigation evidence. *Boyde*, in its view, reasoned that a jury would be unlikely to disregard mitigating evidence as to character because of the long-held social belief that defendants who commit criminal acts attributable to a disadvantaged background may be less culpable than defendants who have no such excuse. As to postcrime mitigating evidence, however, the Court of Appeals concluded that "there is reason to doubt that a jury would similarly consider post-crime evidence of a defendant's religious conversion and good behavior in prison." 346 F. 3d, at 1212. It cited no precedent of this Court to support that supposition.

In addition, it reasoned that unlike in *Boyde* the prosecutor in Payton's case misstated the law and the trial court did

not give a specific instruction rejecting that misstatement, relying instead on a general admonition that counsel's arguments were not evidence. These two differences, the Court of Appeals concluded, made Payton's case unlike *Boyde*. 346 F. 3d, at 1216. In its view, the factor (k) instruction was likely to have misled the jury and it was an unreasonable application of this Court's cases for the California Supreme Court to have concluded otherwise.

## II

AEDPA provides that, when a habeas petitioner's claim has been adjudicated on the merits in state-court proceedings, a federal court may not grant relief unless the state court's adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U. S. C. § 2254(d)(1). A state-court decision is contrary to this Court's clearly established precedents if it applies a rule that contradicts the governing law set forth in our cases, or if it confronts a set of facts that is materially indistinguishable from a decision of this Court but reaches a different result. *Williams* v. *Taylor, supra,* at 405; *Early* v. *Packer,* 537 U. S. 3, 8 (2002) *(per curiam).* A state-court decision involves an unreasonable application of this Court's clearly established precedents if the state court applies this Court's precedents to the facts in an objectively unreasonable manner. *Williams* v. *Taylor, supra,* at 405; *Woodford* v. *Visciotti,* 537 U. S. 19, 24–25 (2002) *(per curiam).* These conditions for the grant of federal habeas relief have not been established.

## A

The California Supreme Court was correct to identify *Boyde* as the starting point for its analysis. *Boyde* involved a challenge to the same instruction at issue here, factor (k). As to the text of factor (k), *Boyde* established that it does

not limit the jury's consideration of extenuating circumstances solely to circumstances of the crime. See 494 U. S., at 382. In so holding, we expressly rejected the suggestion that factor (k) precluded the jury from considering evidence pertaining to a defendant's background and character because those circumstances did not concern the crime itself. *Boyde* instead found that factor (k), by its terms, directed the jury to consider any other circumstance that might excuse the crime, including factors related to a defendant's background and character. We held:

> "The [factor (k)] instruction did not, as petitioner seems to suggest, limit the jury's consideration to 'any other circumstance *of the crime* which extenuates the gravity of the crime.' The jury was directed to consider *any other circumstance* that might excuse the crime, which certainly includes a defendant's background and character." *Ibid.* (emphasis in original).

The California Supreme Court read *Boyde* as establishing that the text of factor (k) was broad enough to accommodate the postcrime mitigating evidence Payton presented. *People* v. *Payton,* 3 Cal. 4th, at 1070, 839 P. 2d, at 1048. The Court of Appeals held *Boyde*'s reasoning did not control Payton's case because *Boyde* concerned precrime, not postcrime, mitigation evidence. 346 F. 3d, at 1211–1212.

We do not think that, in light of *Boyde*, the California Supreme Court acted unreasonably in declining to distinguish between precrime and postcrime mitigating evidence. After all, *Boyde* held that factor (k) directed consideration of any circumstance that might excuse the crime, and it is not unreasonable to believe that a postcrime character transformation could do so. Indeed, to accept the view that such evidence could not because it occurred after the crime, one would have to reach the surprising conclusion that remorse could never serve to lessen or excuse a crime. But remorse, which by definition can only be experienced after a crime's

commission, is something commonly thought to lessen or excuse a defendant's culpability.

## B

That leaves respondent to defend the decision of the Court of Appeals on grounds that, even if it was at least reasonable for the California Supreme Court to conclude that the text of factor (k) allowed the jury to consider the postcrime evidence, it was unreasonable to conclude that the prosecutor's argument and remarks did not mislead the jury into believing it could not consider Payton's mitigation evidence. As we shall explain, however, the California Supreme Court's conclusion that the jury was not reasonably likely to have accepted the prosecutor's narrow view of factor (k) was an application of *Boyde* to similar but not identical facts. Even on the assumption that its conclusion was incorrect, it was not unreasonable, and is therefore just the type of decision that AEDPA shields on habeas review.

The following language from *Boyde* should be noted at the outset:

> "We think the proper inquiry in such a case is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence. . . . Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting." 494 U. S., at 380–381 (footnote omitted).

Unlike in *Boyde* the prosecutor here argued to jurors during his closing that they should not consider Payton's mitigation evidence, evidence which concerned postcrime as op-

posed to precrime conduct. Because *Boyde* sets forth a general framework for determining whether a challenged instruction precluded jurors from considering a defendant's mitigation evidence, however, the California Supreme Court was correct to structure its own analysis on the premises that controlled *Boyde*. The *Boyde* analysis applies here, and, even if it did not dictate a particular outcome in Payton's case, it refutes the conclusion of the Court of Appeals that the California Supreme Court was unreasonable.

The prosecutor's mistaken approach appears most prominently at three different points in the penalty phase. First, in chambers and outside the presence of the jury he argued to the judge that background and character (whether of precrime or postcrime) was simply beyond the ambit of the instruction. Second, he told the jurors in his closing statement that factor (k) did not allow them to consider what happened "after the [crime] or later." App. 68. Third, after defense counsel objected to his narrow view, he argued to the jury that it had not heard any evidence of mitigation. *Id.*, at 70. *Boyde*, however, mandates that the whole context of the trial be considered. And considering the whole context of the trial, it was not unreasonable for the state court to have concluded that this line of prosecutorial argument did not put Payton's mitigating evidence beyond the jury's reach.

The prosecutor's argument came after the defense presented eight witnesses, spanning two days of testimony without a single objection from the prosecution as to its relevance. As the California Supreme Court recognized, like in *Boyde*, for the jury to have believed it could not consider Payton's mitigating evidence, it would have had to believe that the penalty phase served virtually no purpose at all. Payton's counsel recognized as much, arguing to the jury that "[t]he whole purpose for the second phase [of the] trial is to decide the proper punishment to be imposed. Everything that was presented by the defense relates directly to

that." App. 88. He told the jury that if the evidence Payton presented was not entitled to consideration, and therefore "all the evidence we presented [would not be] applicable, why didn't we hear any objections to its relevance?" *Ibid.* The prosecutor was not given an opportunity to rebut defense counsel's argument that factor (k) required the jury to consider Payton's mitigating evidence.

For his part, the prosecutor devoted specific attention to disputing the sincerity of Payton's evidence, stating that "everybody seems to get religion in jail when facing the death penalty" and that "[s]tate prison is full of people who get religion when they are in jail." *Id.*, at 74. Later, he intimated the timing of Payton's religious conversion was suspect, stating "he becomes a newborn Christian, after he's in custody" after "he gets caught." *Ibid.* As the California Supreme Court reasonably surmised, this exercise would have been pointless if the jury believed it could not consider the evidence.

Along similar lines, although the prosecutor characterized Payton's evidence as not being evidence of mitigation, he devoted substantial attention to discounting its importance as compared to the aggravating factors. He said:

"The law in its simplicity is that the aggravating—if the aggravating factors outweigh the mitigating, the sentence the jury should vote for should be the death penalty. How do the factors line up? The circumstances and facts of the case, the defendant's other acts showing violence . . . , the defendant's two prior convictions line up against really nothing except [the] defendant's newborn Christianity and the fact that he's 28 years old. This is not close. You haven't heard anything to mitigate what he's done. If you wanted to distribute a thousand points over the factors, 900 would have to go to what he did to [the victim], and I really doubt if [defense counsel] would dispute that breakdown of the facts." *Id.*, at 76.

Indeed, the prosecutor characterized testimony concerning Payton's religious conversion as "evidence" on at least four separate occasions. *Id.*, at 68, 70, 73. In context, it was not unreasonable for the state court to conclude that the jury believed Payton's evidence was neither credible nor sufficient to outweigh the aggravating factors, not that it was not evidence at all.

To be sure, the prosecutor advocated a narrow interpretation of factor (k), an interpretation that neither party accepts as correct. There is, however, no indication that the prosecutor's argument was made in bad faith, nor does Payton suggest otherwise. In addition, the first time the jury was exposed to the prosecutor's narrow and incorrect view of factor (k), it had already heard the entirety of Payton's mitigating evidence. Defense counsel immediately objected to the prosecutor's narrow characterization, and the trial court, noting at a side bar that one could "argue it either way," admonished the jury that "the comments by both the prosecution and the defense are not evidence. You've heard the evidence and, as I said, this is argument. And it's to be placed in its proper perspective." *Id.*, at 69–70.

The trial judge, of course, should have advised the jury that it could consider Payton's evidence under factor (k), and allowed counsel simply to argue the evidence's persuasive force instead of the meaning of the instruction itself. The judge is, after all, the one responsible for instructing the jury on the law, a responsibility that may not be abdicated to counsel. Even in the face of the trial court's failure to give an instant curative instruction, however, it was not unreasonable to find that the jurors did not likely believe Payton's mitigation evidence beyond their reach. The jury was not left without any judicial direction. Before it began deliberations as to what penalty was appropriate, the court instructed it to consider all evidence received "during any part of the trial in this case, except as you may be hereafter instructed," *id.*, at 94, and it was not thereafter instructed

to disregard anything. It was also instructed as to factor (k) which, as we held in *Boyde,* by its terms directs jurors to consider any other circumstance that might lessen a defendant's culpability.

Testimony about a religious conversion spanning one year and nine months may well have been considered altogether insignificant in light of the brutality of the crimes, the prior offenses, and a proclivity for committing violent acts against women. It was not unreasonable for the state court to determine that the jury most likely believed that the evidence in mitigation, while within the reach of the factor (k) instruction, was simply too insubstantial to overcome the arguments for imposing the death penalty; nor was it unreasonable for the state court to rely upon *Boyde* to support its analysis. Even were we to assume the "'relevant state-court decision applied clearly established federal law erroneously or incorrectly,'" *Lockyer* v. *Andrade,* 538 U. S. 63, 76 (2003) (quoting *Williams* v. *Taylor,* 529 U. S., at 411), there is no basis for further concluding that the application of our precedents was "objectively unreasonable," *Lockyer, supra,* at 76. The Court of Appeals made this last mentioned assumption, and it was in error to do so. The judgment of the Ninth Circuit is reversed.

*It is so ordered.*

THE CHIEF JUSTICE took no part in the decision of this case.

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, concurring.

I join the Court's opinion, which correctly holds that the California Supreme Court's decision was not "contrary to" or "an unreasonable application of" our cases. 28 U. S. C. § 2254(d)(1). Even if our review were not circumscribed by statute, I would adhere to my view that limiting a jury's discretion to consider all mitigating evidence does not violate

the Eighth Amendment. See *Walton* v. *Arizona,* 497 U. S. 639, 673 (1990) (SCALIA, J., concurring in part and concurring in judgment).

JUSTICE BREYER, concurring.

In my view, this is a case in which Congress' instruction to defer to the reasonable conclusions of state-court judges makes a critical difference. See 28 U. S. C. § 2254(d)(1). Were I a California state judge, I would likely hold that Payton's penalty-phase proceedings violated the Eighth Amendment. In a death case, the Constitution requires sentencing juries to consider all mitigating evidence. See, *e. g., Penry* v. *Lynaugh,* 492 U. S. 302, 319 (1989). And here, there might well have been a "reasonable likelihood" that Payton's jury interpreted factor (k), 1 Cal. Jury Instr., Crim., No. 8.84.1(k) (4th rev. ed. 1979), "in a way that prevent[ed]" it from considering "constitutionally relevant" mitigating evidence—namely, evidence of his postcrime religious conversion. *Boyde* v. *California,* 494 U. S. 370, 380 (1990).

Unlike *Boyde,* the prosecutor here told the jury repeatedly—and incorrectly—that factor (k) did not permit it to take account of Payton's postcrime religious conversion. See *post,* at 154–155, 159–160 (SOUTER, J., dissenting). Moreover, the trial judge—also incorrectly—did nothing to correct the record, likely leaving the jury with the impression that it could not do that which the Constitution says it *must.* See *ante,* at 146 (majority opinion); *post,* at 159–160. Finally, factor (k) is ambiguous as to whether it encompassed Payton's mitigation case. Factor (k)'s text focuses on evidence that reduces a defendant's moral culpability for committing the offense. And evidence of postcrime conversion is less obviously related to moral culpability than is evidence of precrime background and character. See *Boyde, supra,* at 382, n. 5 (suggesting a distinction between precrime and postcrime evidence). For all these reasons, one could conclude that the jury here might have thought factor (k) barred

its consideration of mitigating evidence, even if the jury in *Boyde* would not there have reached a similar conclusion.

Nonetheless, in circumstances like the present, a federal judge must leave in place a state-court decision unless the federal judge believes that it is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." § 2254(d)(1). For the reasons that the Court discusses, I cannot say that the California Supreme Court decision fails this deferential test. I therefore join the Court's opinion.

JUSTICE SOUTER, with whom JUSTICE STEVENS and JUSTICE GINSBURG join, dissenting.

From a time long before William Payton's trial, it has been clear law under the Eighth and Fourteenth Amendments that a sentencing jury in a capital case must be able to consider and give effect to all relevant mitigating evidence a defendant offers for a sentence less than death. The prosecutor in Payton's case effectively negated this principle in arguing repeatedly to the jury that the law required it to disregard Payton's mitigating evidence of postcrime religious conversion and rehabilitation. The trial judge utterly failed to correct these repeated misstatements or in any other way to honor his duty to give the jury an accurate definition of legitimate mitigation. It was reasonably likely in these circumstances that the jury failed to consider Payton's mitigating evidence, and in concluding otherwise, the Supreme Court of California unreasonably applied settled law, with substantially injurious effect. The Court of Appeals was correct, and I respectfully dissent.

## I

At the time the Supreme Court of California took up Payton's direct appeal of his death sentence for homicide, it was settled law that a capital defendant has a plenary right to present evidence going to any aspect of his character, back-

ground, or record, as well as to any circumstance particular to the offense, that might justify a sentence less than death, *Penry* v. *Lynaugh*, 492 U. S. 302 (1989); *Eddings* v. *Oklahoma*, 455 U. S. 104 (1982); *Lockett* v. *Ohio*, 438 U. S. 586 (1978), including evidence of the defendant's behavior after the offense, *Skipper* v. *South Carolina*, 476 U. S. 1, 4–5 (1986). The law was equally explicit that the sentencer may not refuse to consider any evidence in mitigation, or be precluded from giving it whatever effect it may merit. *Penry* v. *Lynaugh, supra*, at 318–320; *Eddings* v. *Oklahoma, supra*, at 113–114.

When Payton was tried, California's sentencing law was not well designed to satisfy the State's obligation to provide the sentencer with a way to give effect to all mitigating evidence including developments after commission of the crime. Trial courts were generally bound to charge a sentencing jury to take into account and be guided by a set of legislatively adopted pattern instructions that described relevant subjects of aggravation and mitigation in terms of 11 "factors." These factors ran the gamut from a defendant's age and state of mind at the time of the crime to a qualified catchall at the end: " '(k) [a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime.' " *Boyde* v. *California*, 494 U. S. 370, 373–374, and n. 1 (1990); 1 Cal. Jury Instr., Crim., No. 8.84.1 (4th rev. ed. 1979).

This catchall provision, known as factor (k), was the subject of *Boyde*, in which the capital defendant had presented extensive testimony of favorable character in struggling against great childhood disadvantages. 494 U. S., at 381–383. It was understood that the evidence was not open to the jury's consideration under any factor except possibly (k), and the question was whether the instruction to consider "[a]ny other circumstance which extenuates the gravity of the crime" adequately conveyed the idea that character was

such a circumstance, even though it was not a fact limited to the setting of the crime itself.

The Court first laid down the general standard: "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Id.*, at 380. A "reasonable likelihood" is more than a mere possibility that the jury mistook the law, but a defendant "need not establish that the jury was more likely than not to have been impermissibly inhibited by the instruction." *Ibid.* A majority of the Court then concluded on the facts of Boyde's trial that there had been no showing that any ambiguity in the instruction had kept the jury from considering the character evidence. *Id.*, at 383–385.

In support of its application of the general standard in Boyde's case, the Court noted that not all of the other factors in the instruction were tied to the specifics of the crime; the defendant's youth at the time of commission could be considered, for example, along with prior criminal activity and prior felony record. *Id.*, at 383. It was, moreover, only natural for the jury to consider evidence of character in the face of hardships, since society generally holds people less culpable for bad acts related to disadvantages in life. *Id.*, at 382, and n. 5. The Court found it highly implausible that the jury would have thought it had to ignore testimony of such evidence, spanning four days and generating over 400 pages of transcript. *Id.*, at 383–384. The pattern instructions as read by the judge included the admonition to make the penalty decision after considering "'all of the evidence which has been received during any part of the trial,'" *id.*, at 383 (emphasis deleted), and the prosecutor never claimed that the testimony was not relevant, *id.*, at 385. Rather, "the prosecutor explicitly assumed that petitioner's character evidence was a proper factor in the weighing process, but argued that it was minimal in relation to the aggravating circumstances." *Ibid.*

## II

Payton, too, was sentenced to death by a jury that had been given a version of the same pattern instructions, including factor (k). Both the nature of Payton's evidence, however, and the behavior of Payton's prosecutor contrasted sharply with their counterparts in *Boyde*, and in a significant respect the version of the pattern instructions read to Payton's jury differed from the version the *Boyde* jury heard.

Although the penalty phase of Payton's trial stretched over three days, mitigation evidence offered through testimony on Payton's behalf came in during parts of two half days. App. 15–54. In the first such session, two witnesses, one a minister and the other her congregation's missions director, said that since the commission of his crimes Payton had made a "commitment to the Lord" that they believed to be sincere, *id.*, at 18, 23; that he had demonstrated remorse, *id.*, at 18; and that he manifested his new faith in Bible study, writing, and spiritual help to fellow inmates, *id.*, at 22–29. Because Payton's remaining witnesses were not available, the trial judge excused the jury after just "a short day." *Id.*, at 31.

Following a weekend break, six witnesses appeared for Payton, including four former fellow inmates who testified that he frequently led religious discussions among prisoners, that he exerted "a very good influence" on others, *id.*, at 34, and that he "always tr[ied] to help people out," *id.*, at 39. See generally *id.*, at 32–44. A fifth witness, a deputy sheriff at Payton's jail, corroborated this testimony, *id.*, at 45–48, and said that he was glad to have Payton at the jail because he had a calming influence on other inmates, and because he occasionally informed the authorities of developing problems, *id.*, at 49. Finally, Payton's mother testified that she had seen a change in him during incarceration and believed his religious conversion was sincere. *Id.*, at 52–54. Thus, Payton's evidence went entirely to his postcrime conversion and

his potential for rehabilitation and usefulness; the presentation of this evidence produced a transcript of only 50 pages.

The trial court sent the case to the jury the next day, after meeting with the prosecutor and defense counsel to discuss the charge, including the factor (k) instruction to consider any other circumstance extenuating the gravity of the crime. *Boyde* had not been decided at that point, and defense counsel expressed concern that factor (k) could be understood to exclude consideration of Payton's mitigating evidence because the facts shown "have something to do with his potential for rehabilitation or his character or his background, but they don't have anything to do with the crime itself . . . ." App. 55. The prosecutor readily agreed with that reading. He responded that the language of factor (k) was intended to reach only circumstances extenuating the gravity of the crime, to the exclusion of character and background. *Ibid.* Indeed, the prosecutor maintained that he did not see "any ambiguity" in factor (k), *id.*, at 57, and that if the legislature had meant background or character to be considered under factor (k), it would have said so explicitly, *id.*, at 58.

The trial court agreed with defense counsel that background and character (including the claimed conversion) should be subject to consideration under factor (k), but declined to alter the instruction because it was hesitant to depart from the statutory text. *Id.*, at 58, 61. Instead, the judge advised the lawyers that they were free to "argue [that] the defendant's character, background, history, mental condition, physical condition . . . certainly fall into category 'k' and certainly make a clear argument to the jury." *Id.*, at 59. After the judge said explicitly that he thought " 'k' is the all encompassing one that includes . . . what you want added," *id.*, at 60, defense counsel lobbied one last time for a more accurate instruction, but was rebuffed:

> "[Defense counsel]: My only problem is I think we all agree that that's the law, but the jury's not going to know.

"The Court: I agree with you. . . . But I'm going to deny [your request], and for the reasons stated." *Id.*, at 61.

The trial court then brought in the jury for argument and charge. When the prosecutor's closing argument got to the subject of factor (k), this is what he said to the jury:

" 'K' says any other circumstance which extenuates or lessens the gravity of the crime. What does that mean? That to me means some fact—okay?—some factor[s] at the time of the offense that somehow operates to reduce the gravity for what the defendant did. It doesn't refer to anything after the fact or later. That's particularly important here because the only defense evidence you have heard has been about this new born Christianity." *Id.*, at 68.

Payton's lawyer interrupted, both counsel approached the bench, and, out of the jury's hearing, defense counsel moved for mistrial on the ground that the prosecutor's statement was "completely contrary" to the previously agreed interpretation of factor (k). *Ibid.* When the prosecutor replied that defense counsel was wrong and that Payton's mitigating evidence did not fall within factor (k), *id.*, at 69, the trial court failed to resolve the matter, saying that "you can argue it either way," *ibid.* Upon return to open court, the judge instructed the jury that "the comments by both the prosecution and the defense are not evidence. You've heard the evidence and, as I said, this is argument. And it's to be placed in its proper perspective." *Id.*, at 69–70.

The prosecutor then took up exactly where he had left off, arguing that Payton's proffered mitigating evidence could not be considered in the jury's deliberations:

"Referring back to 'k' which I was talking about, any other circumstance which extenuates or lessens the gravity of the crime, the only defense evidence you've heard had to do with defendant's new Christianity and

that he helped the module deputies in the jail while he was in custody.

"The problem with that is that evidence is well after the fact of the crime and cannot seem to me in any way to logically lessen the gravity of the offense that the defendant has committed.

"[Defense counsel] will tell you that somehow that becoming a newborn Christian, if in fact he really believed that took place, makes it a less severe crime, but there is no way that can happen when—under any other circumstance which extenuates or lessens the gravity of the crime, refers—seems to refer to a fact in operation at the time of the offense.

"What I am getting at, you have not heard during the past few days any legal evidence mitigation. What you've heard is just some jailhouse evidence to win your sympathy, and that's all. You have not heard any evidence of mitigation in this trial." *Id.*, at 70.

After the prosecutor recounted the aggravating circumstances and argued for the death penalty, he turned to the evidence of Payton's religious conversion, questioned its sincerity, and argued that it did not warrant a sentence less than death when weighed against the aggravating factors. Throughout this discussion, he returned to his point that factor (k) authorizes consideration only of facts as of the time of the crime. He reminded the jurors again that they had "heard no evidence of any mitigating factors." *Id.*, at 73. And again: "I don't really want to spend too much time on [religion] because I don't think it's really applicable and I don't think it comes under any of the eleven factors." *Ibid.* And again: "You haven't heard anything to mitigate what he's done." *Id.*, at 76.

With the prosecutor arguing that Payton's mitigation evidence was not open to consideration under (k) or any other factor, and with the trial judge sitting on the fence, defense counsel was left to argue the law himself, stating that "sec-

tion (k) may be awkwardly worded, but it does not preclude or exclude the kind of evidence that was presented. It's a catch-all ph[r]ase. It was designed to include, not exclude, that kind of evidence." *Id.*, at 88. Defense counsel discussed the mitigating evidence at some length before concluding that "I think there are a lot of good reasons to keep Bill Payton alive, an awful lot of good reasons. And that's exactly what I think 'k' is talking about." *Id.*, at 92.

The trial court then gave the jury its final instructions:

> "In determining the penalty to be imposed on the defendant, you shall consider all of the evidence which has been received during any part of the trial in this case, except as you may be hereafter instructed. You shall consider, take into account and be guided by the following factors, [including] . . . (k), [which says] [a]ny other circumstance which extenuates the gravity of the crime even though not a legal excuse for the crime. . . .
>
> "After having heard all of the evidence and after having heard and considered the argument of counsel, you shall consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed.
>
> "If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death.
>
> "However, if you determine that the mitigating circumstances outweigh the aggravating circumstances, you shall impose a sentence of confinement in the state prison for life without the possibility of parole." *Id.*, at 94–96.

The jury returned a death verdict.

### III

The failure of the State to provide Payton with a process for sentencing that respected his clearly established right to

consideration of all mitigating evidence is plain at every step of the jury's instruction, starting with the trial court's reliance on the pattern jury charge adopted by the legislature.

## A

It is undisputed that factor (k) was the instruction that comes closest to addressing the jury's obligation to consider Payton's evidence of postoffense conversion, and the prosecutor's remarks in the chambers colloquy both demonstrate the inadequacy of factor (k) to explain that responsibility and point to the seriousness of the trial court's failure to give a group of laypersons an intelligible statement of the controlling law. Factor (k) calls on the jury to consider evidence going to the "gravity of the crime," a notion commonly understood as the joint product of intent, act, and consequence: intentionally shooting a police officer through the heart is worse than knocking down a pedestrian by careless skateboarding. It is coherent with this understanding to say, as the Court did in *Boyde*, that evaluating a defendant's state of mind at the time of the offense can include consideration of his general character and the experiences that affected its development, 494 U. S., at 381–382; as the Court explained, when society sits in judgment, it does not ignore the early hardships of those who turn out bad, *id.*, at 382. But it would be more than a stretch to say that the seriousness of the crime itself is affected by a defendant's subsequent experience. A criminal's subsequent religious conversion is not a fact commonly accepted as affecting the gravity of the crime, and even jurors who could overcome their skepticism about the sincerity of the conversion claim would see it as addressed not to the nature of the crime but to other issues bearing on sentence: the moral argument for executing a defendant who claims to have realized the awfulness of what he had done, and the practical argument for protecting others in the future by taking a life of one who claims to have been transformed. See, *e. g., Skipper* v. *South Carolina*, 476

U. S., at 4–5. I will assume that a jury instructed by a judge to consider evidence of postoffense experience that extenuates the gravity of the crime could have given effect to the instruction, but without such an explanation it would have been unnatural to think of evidence of later events as affecting the seriousness of an earlier crime.

Indications of the way factor (k) was understood in California at the time of Payton's trial, in fact, point this way. The prosecutor who spoke for the State at the trial repeatedly argued to judge and jury that a "circumstance which extenuates or lessens the gravity of the crime, refers—seems to refer to a fact in operation at the time of the offense." App. 70. The prosecutor held this view in good faith, *ante*, at 146 (majority opinion), and, indeed, his view was shared by the state judiciary; even before *Boyde*, the Supreme Court of California had found factor (k) inadequate to require consideration of all types of mitigating evidence. In 1983, following our discussion in *Eddings*, that court directed that factor (k) be adorned in future cases so as to inform the jury that it may consider "any other 'aspect of [the] defendant's character or record . . . that the defendant proffers as a basis for a sentence less than death.'" *People* v. *Easley*, 34 Cal. 3d 858, 878, n. 10, 671 P. 2d 813, 826, n. 10 (alterations in original). And, again before *Boyde* came down, the Legislature of California amended factor (k) to instruct the jury to consider "'[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime [and any sympathetic or other aspect of the defendant's character or record [that the defendant offers] as a basis for a sentence less than death, whether or not related to the offense for which he is on trial . . . ].'" 494 U. S., at 374, n. 2 (quoting 1 Cal. Jury Instr., Crim., No. 8.85(k) (5th ed. 1988); alterations in original). Without that amendment, any claim that factor (k) called for consideration of a defendant's personal development in the wake of his crime

was simply at odds with common attitudes and the English language.

## B

The next step in the process that failed to give the jury an intelligible instruction to consider all mitigating evidence consisted of the prosecutor's repeated statements telling the jury to ignore Payton's conversion evidence because it was not legally relevant:

> "[Defense counsel] will tell you that somehow that becoming a newborn Christian, if in fact he really believed that took place, makes it a less severe crime, but there is no way that can happen when—under any other circumstance which extenuates or lessens the gravity of the crime, refers—seems to refer to a fact in operation at the time of the offense.
>
> "What I am getting at, you have not heard during the past few days any legal evidence mitigation. What you've heard is just some jailhouse evidence to win your sympathy, and that's all. You have not heard any evidence of mitigation in this trial." App. 70.

Although the prosecutor's argument rested on a perfectly fair reading of the text of the pattern instruction, its effect, in the absence of any further instruction, was to tell the jury that it could not consider the conversion evidence as mitigating. Payton's lawyer immediately objected. He expressed his understanding that the trial judge had agreed that consideration of the mitigating evidence was constitutionally required and meant to let respective counsel argue only about its probative value, even though the judge himself had refused to address this essential constitutional issue specifically in any particular instruction. One would reasonably suppose that the trial judge would have realized that the prosecutor's argument put him on the spot, forcing him to correct the misleading statement of law with an explicit instruction that the jury was free to treat the conversion evi-

dence as mitigating, evaluating its weight as the jury saw fit. It is, after all, elementary law, federal and state, that the judge bears ultimate responsibility for instructing a lay jury in the law. *Carter* v. *Kentucky*, 450 U. S. 288, 302–303 (1981); *Bollenbach* v. *United States*, 326 U. S. 607, 612–614 (1946); *Quercia* v. *United States*, 289 U. S. 466, 469 (1933); *Sparf* v. *United States*, 156 U. S. 51, 102 (1895); *People* v. *Roberge*, 29 Cal. 4th 979, 988, 62 P. 3d 97, 102 (2003); *People* v. *Beardslee*, 53 Cal. 3d 68, 97, 806 P. 2d 1311, 1326 (1991). But the trial judge did no such thing. Instead, he merely told the jury that the prosecutor's argument was not evidence. This instruction cured nothing. The prosecutor's objectionable comment was not a statement about evidence but a statement of law. Telling the jury that a statement of law was not evidence did nothing to correct its functional error in misstating the law.

It is true that the prosecutor argued that Payton's post-crime evidence was not only beyond the jury's consideration legally, but also insufficient to outweigh the aggravating circumstances. The prosecutor, however, minimized the significance even of these brief observations by saying, "I don't really want to spend too much time on it because I don't think it's really applicable and I don't think it comes under any of the eleven factors." App. 73. Far from "explicitly assum[ing]" that the jury's consideration of the evidence was proper, *Boyde*, 494 U. S., at 385, the prosecutor's comments, interwoven with his clear statements on the scope of factor (k), could not have left the listener with any doubt about the prosecutor's view of the legal relevance of the evidence.

Nothing could be further from the circumstances in *Boyde*. There the prosecutor agreed that the character evidence was properly subject to the jury's consideration as mitigating, even under the ambiguous terms of factor (k). *Ibid.* The *Boyde* jury heard argument about the weight of the evidence, but not a word denying its relevance. *Ibid.* Indeed, the *Boyde* majority specifically distinguished the facts before

it from the facts confronting us here, in disclaiming any suggestion "that prosecutorial misrepresentations may never have a decisive effect on the jury," *id.*, at 384; "arguments of counsel, like the instructions of the court, must be judged in the context in which they are made," *id.*, at 385. If the *Boyde* majority thus anticipated a case like this one, with a possibility of substantial prejudice arising from misrepresentation of the law, the Court's prescience is attributable to the State's position in the *Boyde* argument: the Supervising Deputy Attorney General of California appearing for the State in *Boyde* urged the Court to see that case in a light favorable to the State, in contrast to Payton's case, to which counsel referred by name, as a case in which the prosecutor had "misled the jurors." Tr. of Oral Arg. in O. T. 1989, No. 88–6613, p. 29. *Boyde* is thus no authority for giving the State a pass here. The Court is faced with the prosecutor's conceded misstatement, *ante*, at 138 (majority opinion), misleading to the jury, which obliged the trial court, however "reluctant to strike out on its own" beyond the pattern instructions, to "do more than figuratively throw up its hands." *People* v. *Beardslee, supra,* at 97, 806 P. 2d, at 1326.

## C

The final misstep that distinguishes this case from the authority of *Boyde* is the judge's charge, which must be understood against the background of the mitigating testimonial evidence that the jury did, after all, hear. At each stage of Payton's appeal and collateral challenge, the State has argued that it makes no sense to suggest the jury would have disregarded substantive evidence with no other purpose than mitigation, when ignoring it would have meant that Payton's mitigation witnesses were just putting on a pointless charade. An argument like this was one of the reasons for affirming the conviction in *Boyde, supra,* at 383, and both the Supreme Court of California and the majority today rely on a reprise of it to affirm here, *People* v. *Payton,* 3 Cal. 4th

1050, 1072, 839 P. 2d 1035, 1049 (1992); *ante,* at 144 (majority opinion). This is, however, an argument to be entertained only with great caution in the best of circumstances, and while *Boyde's* circumstances were good, this is a very different case from *Boyde.*

The need for caution is plain: the constitutional concern with mitigating evidence is not satisfied by the mere ability of a defendant to present it. The sentencing body must have a genuine opportunity to consider it and give effect to it. *Penry* v. *Lynaugh,* 492 U. S., at 320. As the Court said in *Boyde,* "[p]resentation of mitigating evidence alone . . . does not guarantee that a jury will feel entitled to consider that evidence." 494 U. S., at 384. For this reason, the Court has found Eighth Amendment violations in circumstances precluding the sentencing body from considering the defendant's mitigating evidence, even where the evidence was extensive and where it accordingly might have been thought unnatural for the sentencer to disregard it. See, *e. g., Penry* v. *Johnson,* 532 U. S. 782, 788, 803–804 (2001); *Eddings* v. *Oklahoma,* 455 U. S., at 107, 113–114.

What is equally plain is that *Boyde* is no authority for thinking the combination of evidence, argument, and charge passes muster here. Boyde's mitigation evidence was extensive enough to take four days and produce over 400 pages of transcript. It addressed character and hardship, subjects recognized by the Court as commonly thought relevant to sentencing, and ignoring it would thus have ignored a large chunk of intuitively acceptable evidence. Payton's evidence, in contrast, required parts of two half days and generated only 50 pages, addressing a claim of dramatic self-reformation that most people would treat with considerable caution. While it would have been unnatural for the jury in *Boyde* to feel barred from considering the character evidence when no lawyer or judge had ever called it irrelevant, Payton's jury had plenty of reason to feel itself precluded: the prosecutor emphatically and repeatedly said that the evi-

dence did not count as the kind of evidence that could extenuate the crime, and the trial judge allowed the prosecutor's statements to go uncorrected.

More significant even than those contrasts between *Boyde* and the facts here is the difference between the two sets of instructions from the trial judges. In *Boyde*, this Court found it significant that "[t]he jury was instructed that it *'shall consider all the evidence* which has been received during any part of the trial of this case.'" 494 U. S., at 383 (emphasis added by *Boyde* majority). Reasonable jurors could therefore hardly "have felt constrained by the factor (k) instruction to *ignore all* of the evidence presented by [the] petitioner during the sentencing phase." *Id.*, at 383–384 (emphasis again supplied by *Boyde* majority).

Here, however, the instruction was different, a variant permitted by the legislature's pattern charge. Here the instruction was not simply to consider all the evidence, but rather, "you shall consider all of the evidence which has been received during any part of the trial in this case, except as you may be hereafter instructed." App. 94. "Hereafter," of course, came the instruction to determine the penalty by applying the 11 enumerated factors, including factor (k). As to the factor (k) focus on the "gravity of the crime," the prosecutor repeatedly had said that evidence of postcrime conversion was irrelevant, and his mistaken and misleading statements of law had never been corrected by the trial judge.

The upshot was this. The jury was told by the judge that some evidence could be excluded from its consideration. The judge presumably had some reason to say this. The only evidence that could reasonably have fallen within the exception was the evidence the prosecutor had just said was legally irrelevant, in a statement that was eminently plausible owing to the language of factor (k) and the subject matter of the evidence. The jurors could naturally have made sense of all they had heard by concluding they were required not

to scrutinize and discount the conversion evidence if they found it unpersuasive, but to skip the scrutiny altogether and ignore the evidence as legally beside the point. This case is nothing like *Boyde*.

But even if the case were closer to *Boyde* than it is, and even if the course of Payton's penalty trial were best viewed the way the majority suggests, that would not satisfy *Boyde*'s test. *Boyde* asks only whether there is a "reasonable likelihood" that the jury understood an instruction as foreclosing consideration of the defendant's mitigating evidence. 494 U. S., at 380. A defendant has no need to show it is "more likely than not" that the jury misunderstood. *Ibid.* Accordingly, even if the best explanation for the jury's verdict were the one the majority offers, that would not resolve Payton's claim. Identifying the "most likely" interpretation of events at Payton's trial, *ante,* at 147 (majority opinion), falls short of negating the reasonably likely alternative that the jury believed it could not consider the story of Payton's postcrime conversion.

The Court's oft-repeated conclusion that the state court did not unreasonably apply *Boyde* seems to rest on two assumptions. The first is a loose understanding of *Boyde* as holding that factor (k) "directs jurors to consider any other circumstance that might lessen a defendant's culpability," *ante,* at 147 (majority opinion). The second is that factor (k) as so understood directs jurors to consider circumstances that do not excuse a crime or lessen a defendant's culpability but nevertheless supply some different (even postcrime) reason to forgo a sentence of death. But *Boyde* held only that the factor (k) instruction tells jurors "to consider any other circumstance that might excuse the crime, which certainly includes a defendant's background and character," 494 U. S., at 382 (emphasis deleted). *Boyde* did not purport to hold that factor (k) naturally called for consideration of postcrime changes of fundamental views. It is thus only by broadening *Boyde* to sanction a misreading of factor (k), a misreading

that the prosecutor himself rejected in good faith, that the Court can find a reasonable application of law in the state court's decision. The mistake will unfortunately reverberate even beyond this case, for the majority further obscures the necessarily inexact distinction between cases that are merely wrong and cases with objectively unreasonable error. Cf. *Penry* v. *Johnson*, 532 U. S. 782 (finding that a confusing jury instruction created a reasonable likelihood the jury would not feel free to consider mitigating evidence, and that the state court's contrary conclusion was "objectively unreasonable," even though the jury heard extensive mitigating evidence submitted without objection as to relevance, even though the judge took care to instruct the jury to consider "'any aspect of the defendant's character and record or circumstances of the crime which you believe could make a death sentence inappropriate,'" *id.*, at 790, even though the prosecutor never questioned the relevance of the evidence when addressing the jury, and even though both counsel argued at length to the jury about the weight of the evidence).

## IV

By the State's admission in this case, the prosecutor's argument was a "misstatement" of constitutional law. By the State's admission in *Boyde*, the prosecutor here "misled" the jury. Despite objection by defense counsel, the trial judge refused to correct the misstatement, which the prosecutor proceeded to repeat. The judge's subsequent charge to consider all evidence was subject to a qualification that the jury could reasonably have understood only as referring to the mitigation evidence the prosecutor had branded as irrelevant under a straightforward reading of the pattern instructions.

If a prosecutor had stood before a jury and denied that a defendant was entitled to a presumption of innocence; if the judge refused to correct him and failed to give any instruction on the presumption of innocence; if the judge's instructions affirmatively suggested there might not be a presump-

tion of innocence; would anyone doubt that there was a reasonable possibility that the jury had been misled? There is no more room here to doubt the reasonable possibility that Payton's jurors failed to consider the postoffense mitigation evidence that the Constitution required them to consider. In a case that contrasts with *Boyde* at every significant step, the State Supreme Court's affirmance of Payton's conviction can only be seen as an unreasonable misapplication of the governing federal standard, not mere error. And since Payton's death sentence is subject to this reasonable possibility of constitutional error, since he may die as a consequence, the effect of the instruction failure is surely substantial and injurious, *Brecht* v. *Abrahamson*, 507 U. S. 619, 638 (1993), beyond any possible excuse as harmless error.