# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-1901

_____

| | | |
|---|---|---|
| Zachary Smith, | * | |
| | * | Appeal from the United States |
| Plaintiff-Appellant, | * | District Court for the |
| | * | Western District of Missouri |
| v. | * | |
| | * | [UNPUBLISHED] |
| Mike Kemna, Superintendent, | * | |
| Crossroads Correctional Center, | * | |
| | * | |
| Defendants-Appellees. | * | |

_____

Submitted: December 9, 2008
Filed: February 2, 2009

_____

Before MELLOY, and BENTON, Circuit Judges, and DOTY,[1] District Judge.

_____

PER CURIAM.

Zachary Smith appeals from the district court's[2] denial of his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. We affirm.

_____

[1]The Honorable David S. Doty, United States District Court for the District of Minnesota, sitting by designation.

[2] The Honorable Ortrie D. Smith, United States District Judge for the Western District of Missouri.

## I.

A jury in Missouri state court convicted Smith of first degree murder and armed criminal action, and he was sentenced to concurrent terms of imprisonment of life without the possibility of parole and ninety-nine years.[3]  Smith's conviction and sentence were affirmed on appeal.  See State v. Smith, 90 S.W.3d 132, 142 (Mo. Ct. App. 2002).  Smith timely petitioned for state post-conviction relief, which the district court denied after an evidentiary hearing.  The Missouri court of appeals affirmed. See Smith v. State, 207 S.W.3d 135, 135 (Mo. Ct. App. 2006) (per curiam). Thereafter, Smith filed this § 2254  petition, asserting eight grounds for relief and requesting an evidentiary hearing. The district court denied the petition and request for hearing but granted a certificate of appealability on Smith's claim that his trial counsel was ineffective for failing to interview and call Alvino Carrillo as a witness.

## II.

We state the facts as recited by the Missouri court of appeals on direct appeal from Smith's conviction.  See Chavez v. Weber, 497 F.3d 796, 799 (8th Cir. 2007).

> On June 23, 1995, at around 10:00 p.m., Zachary Smith left his father's home in Kansas City and started driving around in a borrowed, maroon Buick with Kevin Glavin and Jose Sosa. Smith was armed with a black .45-caliber handgun. The men stopped at a gas station to buy some cigarettes. While they were there, Derek Hoskins rode up on his bicycle. Several weeks earlier, Hoskins had confessed to stealing Smith's lawn mower. Hoskins had promised to pay Smith back for the lawn mower, but never did. About a week earlier, Smith had shown Hoskins a pistol he was carrying and warned him, "You better get my money."

---

[3] Smith's conviction followed two prior trials.  The jury was unable to reach a verdict in the first proceeding and Smith's conviction in the second trial was reversed on appeal.  See State v. Smith, 966 S.W.2d 1, 9 (Mo. Ct. App. 1997).

When Hoskins rode up to the gas station on his bicycle, Smith asked if he had the money he owed him. Hoskins said he did not have the money he owed him, but the money was at his house and he would go and get it. When Hoskins suggested that they follow him to his cousin Tyrone Morgan's house, Smith insisted they put the bike in the trunk and that Hoskins ride with them in the car. During this incident, a witness heard what sounded like two guns being cocked. After placing Hoskins' bicycle in the trunk of the car, they drove to Morgan's home, where Tyrone's younger brother told Hoskins that Tyrone was not home.

After Hoskins got back in the Buick, Smith told him that he could work off the debt by burglarizing a house. Hoskins agreed. Smith took Hoskins' bicycle from the trunk and put it in a field near Smith's house. Smith next drove the group to a house, where Hoskins and Glavin got out of the car. Hoskins knocked on the door, and when nobody answered, he kicked in the door and stole a television set and a stereo, both of which he placed in the trunk of the Buick. The men returned to Smith's house and dropped off the television and the stereo. Smith then informed Hoskins that he would have to commit another burglary to fully repay the debt.

Smith drove the group to the northeast part of the city, where they stopped to buy some beer. After driving around for about half an hour, Glavin told Smith he needed to urinate. They were in an area called Cliff Drive at the time. Smith stopped the car under a streetlight, but then backed the car out of the light, even though the street was deserted. When Hoskins asked if he could get out of the car to urinate, Glavin told him to remain in the vehicle because "something did not feel right." Hoskins told Glavin, "I got to go pee," and got out of the car anyway.

As Hoskins and Glavin stood by the curb urinating, Smith got out of the car and stood behind and in between the two. Glavin then heard a gunshot, looked up, and saw a bright flash. He saw Smith holding a pistol about one to two feet away from Hoskins. Hoskins went limp and fell to the ground. After Smith and Glavin got back in the car, Smith

muttered something about "good measure" and fired another shot out the window at Hoskins.

About sunrise the next day, the three men went to the house of Sosa's girlfriend, Rose Marie Sanchez. Sanchez later told the police that Smith had arrived in a newer, four-door burgundy or red car and had a gun tucked into his waistband. Later that morning, Catherine Stone looked out her window and saw Smith standing next to the maroon car.

Smith then drove back to his father's house, where he and his girlfriend, Cynthia Frost, had been living for about a month. Smith handed his gun to Frost and told her to put it up.

The following day, Smith took Glavin to his bedroom and showed him Hoskins' bicycle, which was now covered in black tape. Smith told Glavin that he was going to give the bicycle to a little kid. Smith later gave the bicycle to a boy who was visiting Smith's father's house.

Smith sought Glavin's help in disposing of the murder weapon. He wanted Glavin to accompany him while he drove across the Chouteau Bridge and threw it in the river. Glavin asked Smith whether Sosa was in on the plan to kill Hoskins. Smith told him that Sosa did not know anything about it, and that he (Smith) was the "master mind." Smith told Glavin that the last words Hoskins said were "I got to go pee" and that Hoskins "had it coming for stealing from him."

Between 3:00 and 4:00 a.m. on June 24, 1995, two security officers patrolling the Cliff Drive area heard gunshots. Later, a man reported that he had seen someone lying in the street who appeared to be seriously injured. The security officers went to the scene, where they found Hoskins' body. When Detective Ron Payne, a crime scene technician, arrived several hours later, he found Hoskins' body lying in the street with his head facing south and the snap of his shorts unfastened. On the ground, Payne found two spent bullets and two shell casings. . . . Police confiscated the bicycle that had belonged to Hoskins.

A police officer spoke with Lori Stone, who lived next door to Smith's father's house. She told the officer that two weeks before Hoskins' death, she had seen Smith fire a black .45-caliber handgun into the air twice. Catherine Stone, Lori's sister, later told officers that she had also seen Smith shoot his gun in the air near his father's house.

Police detectives Roger Lewis and Mark Heimer spoke with Cynthia Frost. Frost told the detectives that she co-owned a house with Smith. On June 27, 1995, detectives asked Frost to sign a consent to search form for Smith's house, and she complied. Frost accompanied the detectives to the house. In one of the bedrooms, the detectives found Smith's driver's license and some personal papers. They also found a locked safe in the bedroom. Frost told the police that the safe was "her and Zach's" and authorized them to open it. One of the detectives quoted Frost as stating that "it was her safe and that we could open it."

The detectives carried the safe out to the front porch, where they forced it open using a hammer, a crowbar, and a heavy-duty screwdriver. Inside the safe, the detectives found a purple Crown Royal bag containing several live .45 rounds and an empty box of .45-caliber ammunition. The safe also contained a Missouri inmate card in the name of Jose Sosa and a Missouri identification card in the name of Zachary Smith.

On June 29, 1995, the police found Smith hiding underneath a bed at 2000 Oakley and arrested him. After receiving and waiving his Miranda rights, Smith told the police that on the evening of June 24, 1995, he had gone bowling with several friends. He said that he and his friends had then gone to his father's house, where they remained until 11:00 a.m. the next morning. Smith denied owning a gun, claimed not to know Glavin,

and stated that he had not seen Hoskins for a month. He also told police that he did not have Hoskins' bicycle, he had not been in a maroon car, and he had not been to Cliff Drive in at least three to four months.

On June 30, 1995, the police examined the Buick for fingerprints. A print taken from the interior of the driver's side door matched Smith's left middle finger. In addition, William Newhouse, a firearms and tool mark examiner with the Kansas City Regional Crime Laboratory, examined the shell casings and bullets collected during the investigation of Hoskins' death. After examining the two shell casings found at the crime scene, the two casings found at Smith's house, and the two casings found at Smith's father's house, Newhouse determined that all six casings had been fired from the same .45-caliber pistol. Newhouse also determined that the bullets recovered from the crime scene were fired from the same pistol.

Smith, 90 S.W.3d at 135-38.

III.

Section 2254 provides for habeas relief from a state court judgment if a petitioner establishes that the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); see also Williams v. Taylor, 529 U.S. 362, 402-3 (2000). A decision is contrary to clearly established federal law if it applies a rule that contradicts Supreme Court precedent. Brown v. Payton, 544 U.S. 133, 141 (2005); Swartz v. Burger, 412 F.3d 1008, 1009-10 (8th Cir. 2005). An unreasonable application of federal law occurs when a state court applies Supreme Court precedent in an "objectively unreasonable manner." Brown, 544 U.S. at 141; Swartz, 412 F.3d at 1009-10. Habeas relief is not warranted when a federal court concludes that a state court erroneously applied federal law. Davis v. Norris, 423 F.3d 868, 875 (8th Cir. 2005) (citing Williams, 529 U.S. at 411). Rather, "the test is whether the state court's

application of the law was unreasonable." Id. We review the district court's findings of fact for clear error and its conclusions of law de novo. Richardson v. Bowersox, 188 F.3d 973, 977 (8th Cir. 1999).

## IV.

To prevail on his ineffective assistance of counsel claim, Smith must show that counsel's performance was deficient and that he was prejudiced by that deficient performance. Strickland v. Washington, 466 U.S. 688, 687 (1984). Our review of counsel's efforts is "highly deferential," and "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Id. at 689-90. Under Strickland's performance prong, we apply an objective standard and "determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." Id. at 690. Strickland's prejudice prong "requires proof 'that there is a reasonable probability that, but for a counsel's unprofessional errors, the result of the proceeding would have been different.'" Lawrence v. Armontrout, 31 F.3d 662, 666 (8th Cir. 1994) (quoting Strickland, 466 U.S. at 694). A reasonable probability is a probability sufficient to undermine confidence in the outcome. See id. In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the jury. Id. Failure to satisfy both prongs is fatal to the claim. See Pryor v. Norris, 103 F.3d 710, 713 (8th Cir. 1997) (no need to reach performance prong if defendant suffered no prejudice from alleged ineffectiveness). An ineffective assistance of counsel claim is a mixed question of law and fact. Parkus v. Bowersox, 157 F.3d 1136, 1138 (8th Cir. 1998).

The Missouri courts concluded that Smith was not prejudiced by his counsel's failure to interview or call Carrillo. Smith argues that this was an unreasonable application of Strickland. Specifically, Smith maintains that Carrillo would have

testified that he was present during the incident at Smith's father's residence and that Smith never fired a gun. Smith argues that this testimony would have undermined Glavin's identification of Smith as the murderer by disproving the link between Smith, the bullets fired at his father's residence and the bullets that killed Hoskins. Moreover, Smith argues that he would have testified if Carrillo had testified. According to Smith, he would have told the jury that Glavin killed Hoskins and that Sosa fired the shots outside of Smith's father's residence. Smith also would have accounted for his fingerprints in the Buick by testifying that he had ridden in the backseat of the car on another occasion.

Even if Carrillo and Smith had testified, there is no reasonable probability that the result of the trial would have been different. Carrillo would have lacked credibility as Smith's longtime friend and a convicted drug dealer who was incarcerated at the time of trial. Further, Carrillo would have testified only to matters collateral to the events on the night of the killing. Moreover, Smith's testimony would not have explained how shell casings matching those found at the murder scene were located inside his house in a locked safe. Nor would Smith's alleged testimony have refuted the testimony of witnesses who saw him with a gun and the victim's property shortly after the murder. Based on the substantial inculpatory evidence presented at trial, we determine that Smith was not prejudiced by his trial counsel's failure to call and interview Carrillo. Accordingly, the Missouri state courts did not unreasonably apply Strickland.

The judgment is affirmed.

_____