Justice Stevens,
with whom Justice Souter, Justice Ginsburg, and Justice Breyer join, dissenting.
In Lockett v. Ohio, 438 U. S. 586 (1978), the Court set aside Ohio’s death penalty statute as unconstitutional because it unduly restricted the mitigating evidence that a jury could consider in deciding whether to impose the death penalty. In his opinion announcing the judgment, Chief Justice Burger wrote:
“There is no perfect procedure for deciding in which eases governmental authority should be used to impose death. But a statute that prevents the sentencer in all capital cases from giving independent mitigating weight to aspects of the defendant’s character and record and to circumstances of the offense proffered in mitigation creates the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty. When the choice is between life and death, that risk is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments.” Id., at 605 (plurality opinion).
The respondent here, Fernando Belmontes, was sentenced to death in 1982, a scant four years after Lockett. See People v. Belmontes, 45 Cal. 3d 744, 755 P. 2d 310 (1988). Yet at the time of his sentencing, there remained significant residual confusion as to whether the Constitution obligated States to permit juries to consider evidence that, while not *26 extenuating the defendant’s culpability for the crime, might nevertheless call for a sentence less than death. Cf. People v. Easley, 34 Cal. 3d 858, 875-880, 671 P. 2d 813, 823-827 (1983) (noting arguments on both sides).
The California death penalty statute in effect in 1982 quite plainly rested on the assumption that California could preclude the consideration of such evidence. The statute commanded that the jury “shall impose” a death sentence if aggravating circumstances outweigh mitigating circumstances, and limited the jury’s inquiry to 11 discrete categories of evidence. See Cal. Penal Code Ann. §190.3 (West 1988). Other than factors relating to the defendant’s age and prior criminal record, every one of those categories relates to the severity of the crime of which the defendant was convicted.[1] *27 And while the eleventh catchall “factor (k)” authorized consideration of “[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime,” § 190.3(k), factor (k)’s restrictive language sent the unmistakable message that California juries could properly give no mitigating weight to evidence that did not extenuate the severity of the crime.
Just a year after respondent’s sentencing the California Supreme Court evinced considerable discomfort with factor (k). In People v. Easley, after discussing the possible unconstitutionality of the penalty phase instructions, the court inserted a critical footnote effectively amending factor (k) and expanding the evidence that a California jury could properly consider in deciding whether to impose a death sentence:
“In order to avoid potential misunderstanding in the future, trial courts — in instructing on [factor (k)] — should inform the jury that it may consider as a mitigating factor ‘any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime’ and any other ‘aspect of [the] defendant’s character or record ... that the defendant proffers as a basis for a sentence less than death.’” 34 Cal. 3d, at 878, n. 10, 671 P. 2d, at 826, n. 10 (emphasis added).[2]
*28 Although Easley came too late to help respondent, the California Supreme Court’s evident concern that capital juries must be permitted to consider evidence beyond that which “extenuates the gravity of the crime” proved prescient. In Skipper v. South Carolina, 476 U. S. 1 (1986) — decided two years before the California Supreme Court affirmed respondent’s conviction and therefore fully applicable here, see Griffith v. Kentucky, 479 U. S. 314, 322-323 (1987) — we expressly rejected the argument, presented in Justice Powell’s separate opinion, that the States retained the authority to determine what mitigating evidence is relevant “as long as they do not foreclose consideration of factors that may tend to reduce the defendant’s culpability for his crime,” see Skipper, 476 U. S., at 11 (opinion concurring in judgment). Apart from the traditional sentencing factors such as “[Evidence concerning the degree of the defendant’s participation in the crime, or his age and emotional history,” Justice Powell would have held that States could properly exclude evidence during a capital sentencing proceeding. Id., at 13. The majority, however, took a more expansive view. Although it recognized that the probative force of Skipper’s excluded evidence “would not relate specifically to petitioner’s culpability for the crime he committed, [there was] no question but that such inferences would be ‘mitigating’ in the sense that they might serve ‘as a basis for a sentence less than death.’ ” Id., at 4-5 (quoting Lockett, 438 U. S., at 604 (plurality opinion); emphasis added). After Skipper, then, the law was clear: A capital jury must be allowed to consider a broader category of mitigating evidence than normally relevant in noncapital proceedings.
Respondent was sentenced, however, before Easley rewrote factor (k) and before Skipper resolved the confusion *29 over whether States had the constitutional latitude to restrict evidence that did not “tend to reduce the defendant’s culpability for his crime,” 476 U. S., at 11 (Powell, J., concurring in judgment). As the following review of the record will underscore, that confusion pervaded every aspect of respondent’s sentencing hearing. It addled the trial judge, the prosecutor, defense counsel, and — inevitably—the jurors themselves.
I
At the sentencing hearing, after the prosecution put on its case — which consisted mainly of evidence of respondent’s previous conduct, see Belmontes, 45 Cal. 3d, at 795,755 P. 2d, at 338-339 — respondent countered with testimony from his grandfather and his mother. That testimony focused almost entirely on respondent’s background: His father drank to excess and savagely beat his wife; his parents were divorced when he was 9 or 10 years old; his mother remarried, but again divorced when respondent was 14 or 15 years old; at this point respondent became difficult to control, and, in 1979, he was sent to the California Youth Authority (Youth Authority); after his release, respondent, did not live with his mother, although he kept in touch with her by telephone and was very close with his 15-year-old sister. See generally App. 5-22.
Next, the jury heard testimony from Robert Martinez and his wife Darlene, both of whom testified that they were close friends with respondent but admitted that they had seen him only once after he was released from the Youth Authority. Id., at 26-27, 35. Robert further testified that respondent was the best man at his wedding and that, prior to his wedding, the two of them would spend a lot of time together, working on Martinez’s car, drinking beer, and smoking marijuana. Id., at 25, 28. The focus of Darlene’s testimony was that she was a born-again Christian, and that, when respondent visited Darlene and her husband after his release from the Youth Authority, he told her that he was also a born-again Christian. Id., at 35-36.
*30 Respondent then testified on his own behalf. When asked about his childhood, respondent answered that he “can’t use it as a crutch to say I am in a situation right now, I’m here now because of that.” Id., at 40. He went on to describe his relationships with his father and grandfather and to relate his experience at the Youth Authority. Id., at 41-45. Respondent testified that, while at the Youth Authority, he became involved in a Christian program and developed a relationship with his sponsors in that program, Beverly and Fred Haro. Id., at 46-48. Upon his release, however, respondent started having problems and abandoned his religious commitment, something he had not yet regained fully at the time of the sentencing hearing. Id., at 53-54. Respondent then described his life in prison and stated that, were he given a life sentence, he would attempt to make a positive contribution to society. Id., at 55-58. On cross-examination, most of the prosecutor’s questions focused on the sincerity of respondent’s religious commitment. Id., at 58-65.
The following day, respondent presented testimony from Reverend Dale Barrett and Don Miller, both ministers who worked at the Youth Authority location where respondent was held. Reverend Barrett described the Youth Authority’s M-2 program through which respondent was matched with the Haros. Id., at 74-76. He then testified about respondent’s involvement with the church and the M-2 program, and how his interactions with respondent led him to believe that he was “salvageable.” Id., at 76-82. Miller similarly testified about respondent’s participation in the program and his belief that respondent would be adept at speaking with other prisoners about accepting religion. Id., at 92, 95-96; see also id., at 96 (testifying that respondent would “[definitely ... be used in the prison system for this sort of activity”).
Finally, the jury heard testimony from respondent’s sponsors in the M-2 program, Fred and Beverly Haro. The *31 Haros described meeting respondent and their experiences with him. See generally id., at 99-104; 110-112. They also testified about how close they had grown to respondent and about respondent’s embrace of religion. Id., at 101-102; 112-113.
Taken as a whole, the sentencing testimony supports three conclusions: First, excepting questions concerning the sincerity of respondent’s religious convictions, there was no significant dispute about the credibility of the witnesses; second, little if any of the testimony extenuated the severity of respondent’s crime; and third, the testimony afforded the jury a principled basis for imposing a sentence other than death.
II
The prosecutor began his closing argument at the penalty phase by describing “th[e] listing of aggravating and mitigating circumstances” and instructing the jury that it must “weigh one against the other.” Id., at 148. While he observed that “there is a proper place for sympathy and passion,” ibid., the prosecutor emphasized that the jury could only consider “the kind of sympathy the instruction tells you to consider [i. e., sympathy that] naturally arises or properly arises from the factors in aggravation and mitigation,” id., at 149 (emphasis added). He repeated to the jury that its duty was to “simpl[y] weig[h]” certain factors that the judge “will tell you that you may take into account,” id., at 150-151, and he went through those listed factors one by one, carefully discussing the evidence that supported each factor, id., at 151-157.
When the prosecutor turned to factor (k), he directly addressed the theory “that the defendant’s religious experience is within that catchall that relates to the defendant at the time he committed the crime, extenuates the gravity of the crime.” Id., at 154. The prosecutor expressed doubt that the jury could consider the evidence at all, stating “I’m not sure it really fits in there. I’m not sure it really fits in any *32 of them. But I think it appears to be a proper subject of consideration.” Ibid. And again, after discussing the evidence supporting respondent’s religious experience, the prosecutor questioned: “[I]s a religious awakening a basis for determining penalty? That’s really the issue, how much does that weigh, or does it weigh on one side or the other.” Id., at 155. Ultimately, the prosecutor concluded: “I suppose you can say it would be appropriate because — in this fashion: The defendant may be of value to the community later.. . . And I think that value to the community is something that you have to weigh in. There’s something to that.” Ibid. But immediately thereafter, the prosecutor told the jury:
“On the other hand, the fact that someone has religion as opposed to someone doesn’t should be no grounds for either giving or withholding life.... So if he says he has religion, does he deserve the other penalty, life? I don’t think that that should be an influencing factor at all in that respect. I don’t think the law contemplates that and I don’t think it’s right.” Ibid, (emphasis added).
In conclusion, the prosecutor described the circumstances of the crime and asserted that “[a] dreadful crime requires a dreadful penalty ... .” Id., at 160.
Following the prosecutor’s closing argument, the trial judge allowed respondent to address the jury directly. Respondent again stated that he could not use his childhood as a crutch to explain his mistakes, and he said that his Christianity, too, could not be used as a crutch. Id., at 162. Respondent then asked to keep his life, explaining that he understood that he had to pay for the victim’s death, but that he wanted the opportunity to try to improve himself in the future. Id., at 163.
Respondent’s attorney, John Schick, then addressed the jury. He made no effort to persuade the jurors that the mitigating evidence somehow extenuated the severity of the *33 crime. On the contrary, he said “I’m not going to insult you by telling you I think [the mitigating evidence] excuses in any way what happened here. That is not the reason I asked these people to come in.” Id., at 166. Instead, he argued that respondent might be able to make a positive contribution in a prison environment. He spoke about the way that respondent improved after he met Beverly and Fred Haro and about the way that respondent’s religion shaped him, observing that religion plays a “very, very vital function . . . in anybody’s life.” Ibid. But Schick took care to emphasize that religion “does not excuse” the murder; rather, the point of that mitigating evidence was to let the jury “know something about the man.” Id., at 167,166. He admitted that respondent “cannot make it on the outside,” id., at 167, recognized that respondent needed to be punished, and asked that the jury impose life in prison, a punishment “that has meaning, that has teeth in it . . . ,” id., at 169. Critically, Schick contended that life in prison was an appropriate sentence because respondent could, if given the chance, “contribute something in whatever way he can.” Id., at 170.
In sum, both counsel agreed that none of the mitigating evidence could detract from the gravity of the crime, and defense counsel even insisted that it would “insult” the jury to suggest that the mitigating evidence “excuses in any way what happened.” Id., at 166.
III
At a conference on jury instructions with the two counsel, the trial judge plainly indicated that he believed that factor (k) circumscribed the mitigating evidence the jury could consider. The judge lifted the principal jury instructions verbatim from 7 of the 11 traditional sentencing factors set forth in the statute, App. 184, but he refused defense counsel’s request to give the jury a separate list of potential mitigating *34 factors, id., at 142-143. Among those requested were two that specifically instructed the jury to consider respondent’s ability to perform constructive work in prison and to live in confinement without acts of violence. See Brief for Respondent 5, n. 1. Those instructions would have been entirely proper — indeed, probably mandated — under our holding in Skipper. But the prosecutor, not having the benefit of Skipper, argued to the judge that “none [of the proposed mitigating instructions] here . . . relates to circumstances concerning the crime. I can’t conceal the fact that I think that is the determinative factor in this case.” App. 142. Agreeing, the judge refused to include the mitigating instructions, making the astonishing statement that the instructions already “seem to be a little over-laden with the factors in mitigation rather than in aggravation.” Ibid.
Of particular importance, the judge modified defense counsel’s request that the jury be told that the instructions did not contain an exhaustive list of mitigating factors. Id., at 141. While he did give such an instruction, ante, at 20, he refused to include the following requested reference to non-statutory factors: “‘You may also consider any other circumstances [relating to the case or the defendant, Mr. Belmontes,] as reasons for not imposing the death sentence.’” Brief for Respondent 25-26; contra, App. 186. The judge thus expressly declined to invite the jury to weigh “potentially infinite mitigators,” contrary to the Court’s assumption today, see ante, at 21. A more accurate summary of his rulings is that the jury could weigh nonstatutory circumstances — but only if they extenuated the severity of respondent’s offense.
IV
The next morning, the trial judge gave the jurors their instructions. He opened with the unyielding admonition that “[y]ou must accept and follow the rules of law as I state them to you,” App. 175, and explained that he was required *35 to read the instructions aloud even though they would have a written copy available during their deliberations, ibid.
After reading a set of boilerplate instructions, id., at 176-183, the judge turned to the subject of “determining which penalty is to be imposed on the defendant,” id., at 183. He told the jury to “consider all of the evidence . . . except as you may be hereafter instructed,” ibid, (emphasis added), and then stated: “You shall consider, take into account and be guided by the following factors, if applicable,” id., at 183-184. He then proceeded to repeat verbatim 7 of the 11 factors set forth in the statute. Id., at 184. Except for the reference to the “age of the defendant at the time of the crime,” ibid., every one of those factors related to the severity of the crime itself. See n. 1, supra. The last of them, the factor (k) instruction, focused the jury’s attention on any circumstance that “extenuates the gravity of the crime even though it is not a legal excuse for the crime.” Ibid. No factor permitted the jury to consider “any other ‘aspect of [the] defendant’s character or record .. . that the defendant proffers as a basis for a sentence less than death.’ ” Easley, 34 Cal. 3d, at 878, n. 10, 671 P. 2d, at 826, n. 10 (quoting Lockett, 438 U. S., at 604 (plurality opinion)).
Emphasizing the importance of the listing of aggravating and mitigating circumstances, the judge next instructed the jury that it “shall consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed.” App. 185 (emphasis added). In other words, in reaching its decision, the jury was to consider each of the “applicable factors” — here, the seven factors the judge just finished reading — and no others.
As the Court points out, ante, at 21, the judge did tell the jury that “the mitigating circumstances which I have read for your consideration are given to you merely as examples of some of the factors that you may take into account as *36 reasons for deciding not to impose ... a death sentence ...,” App. 186. But immediately afterwards, he instructed the jury to “pay careful attention to each of these factors. Any one of them standing alone may support a decision that death is not the appropriate punishment in this case.” Ibid. (emphasis added). Since none of “these factors” (save for the age of the defendant) encompassed any mitigating circumstance unrelated to the severity of the crime, the most natural reading of the instruction is that any mitigating factor that lessens the severity of the offense may support a sentence other than death. On this view, any other mitigating circumstance is simply irrelevant to (in the prosecutor’s words) the “simple weighing” the jury was tasked with performing. Id., at 150.
V
Questions asked by at least six different jurors during almost two full days of deliberation gave the judge an ample opportunity to clarify that the testimony offered on behalf of respondent, if credited by the jury, provided a permissible basis for imposing a sentence other than death. Far from eliminating their obvious confusion, his responses cemented the impression that the jurors’ lone duty was to weigh specified, limited statutory factors against each other.
After a lunch break, the judge reconvened the jury to answer a question that does not appear in the record; in response, the judge merely reread instructions telling the jury that it “must agree, if [it] can,” and that it “shall consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed.” Id., at 185, 188-189 (emphasis added). Because all of those factors were traditional sentencing factors, and because none of them permitted consideration of Skipper-type mitigating evidence, the judge’s response was the functional equivalent of yet another admonition to disregard most of respondent’s evidence.
*37 After a colloquy between the judge and four different jurors (Hailstone, Wilson, Norton, and Huckabay) about the likelihood of reaching a unanimous verdict,[3] other jurors asked the judge a series of questions reflecting a concern about whether it was proper to consider aggravating or mitigating circumstances other than those specifically listed in his instructions:
“JUROR HERN: The statement about the aggravation and mitigation of the circumstances, now, that was the listing?
“THE COURT: That was the listing, yes, ma’am.
“JUROR HERN: Of those certain factors we were to decide one or the other and then balance the sheet?
“THE COURT: That is right. It is a balancing process. Mr. Meyer?
“JUROR MEYER: A specific question, would this be an either/or situation, not a one, if you cannot the other?
“THE COURT: No. It is not that.
“JUROR MEYER: It is an either/or situation?
*38 “THE COURT: Exactly. If you can make that either/or decision. If you cannot, then I will discharge you.
“JUROR HAILSTONE: Could I ask a question? I don’t know if it is permissible. Is it possible that he could have psychiatric treatment during this time?
“THE COURT: That is something you cannot consider in making your decision.” App. 191.
The judge’s responses strongly suggest that the “listing” — the listed statutory factors — was all that the jury could properly consider when “balancing] the sheet.” See n. 1, supra. But it is difficult, if not impossible, to see how evidence relating to future conduct even arguably “extenuate[d] the gravity of the crime”[4] under factor (k), and none of those listed factors gave the jury the chance to consider whether respondent might redeem himself in prison. Cf. Brown v. Payton, 544 U. S. 133, 157 (2005) (SQUTER, J., dissenting) (“[I]t would be more than a stretch to say that the seriousness of the crime itself is affected by a defendant’s subsequent experience”). And rather than inviting an open-ended review of mitigating factors that would include consideration of the defendant’s possible future behavior in prison, the judge’s answers emphasized the constraints on the “either/or” decision the jurors had to make.[5]
*39 The arguments of counsel, the actual instructions to the jury, and this colloquy all support the conclusion that the jurors understood their task was to run through the listed statutory factors and weigh them against each other to determine whether respondent should be sentenced to death. Very little of respondent’s evidence, however, even arguably “extenuate[d] the gravity of the crime.” In my judgment, it is for that reason much more likely than not that the jury believed that the law forbade it from giving that evidence any weight at all. The Court of Appeals therefore correctly set aside respondent’s death sentence. See Boyde v. California, 494 U. S. 370,380 (1990) (plurality opinion) (requiring that a defendant show only that “there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence”).
VI
Nothing in the Court’s opinion in Boyde upsets my view that respondent’s death sentence cannot stand. Over the dissent of four Justices, the Court in Boyde both adopted a new “legal standard for reviewing jury instructions claimed to restrict impermissibly a jury’s consideration of relevant evidence,” id., at 378, and approved a blatantly atextual interpretation of the unadorned factor (k) instruction, id., at 382, and n. 5. Applying its new standard and its dubious reading of factor (k), the Court held that there was “not a reasonable likelihood that Boyde’s jurors interpreted the trial court’s instructions to prevent consideration of mitigating evidence of background and character.” Id., at 381.
The Court rejected Boyde’s argument that factor (k) made it impossible for the jury to consider testimony that Boyde had won a prize for dance choreography while in prison, which Boyde argued was Skipper-type evidence relating to whether “he could lead a useful life behind bars,” 494 U. S., at 382, n. 5. But the Court did not hold or suggest that factor (k) allowed for the consideration of Skipper-type evi *40 denee. Instead, the Court found that the evidence of his dance choreography talents was presented as part of his “overall strategy to portray himself os less culpable than other defendants due to his disadvantaged background and his character strengths,” 494 U. S., at 382, n. 5 (emphasis added), and therefore fell within the ambit of factor (k). Thus, although the Boyde opinion does not state so explicitly, it assumes that the factor (k) instruction would not permit the jury to consider Skipper-type “evidence of postcrime good prison behavior to show that [a defendant] would not pose a danger to the prison community if sentenced to life imprisonment rather than death.” 494 U. S., at 382, n. 5; see also Skipper, 476 U. S., at 4 (recognizing that inferences regarding a defendant’s “probable future conduct if sentenced to life in prison . . . would not relate specifically to [the defendant’s] culpability for the crime he committed”); Payton, 544 U. S., at 164 (Souter, J., dissenting) {“Boyde did not purport to hold that factor (k) naturally called for consideration of postcrime changes of fundamental views”).
Here, respondent contends that there is a reasonable likelihood that the judge’s instructions prevented the jury from considering precrime, forward-looking mitigation evidence regarding the possibility that he would lead a constructive life in a prison setting. Not only does the Court’s opinion in Boyde fail to support the improbable argument that respondent’s mitigating evidence falls within factor (k)’s purview, but its reasoning is entirely consistent with the Court of Appeals’ contrary conclusion.
Similarly, the Court’s recent decision in Payton has little bearing here. In Payton, we granted certiorari to decide whether the Ninth Circuit’s decision affirming the District Court’s grant of habeas relief “was contrary to the limits on federal habeas review imposed by 28 U. S. C. § 2254(d).” 544 U. S., at 136. In concluding that it was, the Court relied heavily on the deferential standard of habeas review established by the Antiterrorism and Effective Death Penalty Act *41 of 1996 (AEDPA), 110 Stat. 1214. See 544 U. S., at 141. And Justice Breyer specifically stated that he only joined the five-Justice majority because “this is a case in which Congress’ instruction to defer to the reasonable conclusions of state-court judges makes a critical difference,” id., at 148 (concurring opinion), explaining that, were he a California state judge, he “would likely hold that Payton’s penalty-phase proceedings violated the Eighth Amendment [because] there might well have been a reasonable likelihood that Pay-ton’s jury interpreted factor (k) in a way that prevented it from considering constitutionally relevant mitigating evidence — namely, evidence of his posterime religious conversion,” ibid, (citation, alteration, and internal quotation marks omitted). The fact that Payton was a case about deference under AEDPA, rather than about a proper understanding of the scope of factor (k), is cause enough to conclude that it does not mandate any specific outcome here.
Indeed, given that respondent’s trial occurred the same year and involved the same jury instructions as Payton’s, compare 544 U. S., at 156 (Souter, J., dissenting) (“ ‘[Y]ou shall consider all of the evidence which has been received during any part of the trial in this case, except as you may be hereafter instructed’”), with App. 183 (same), and because AEDPA does not apply to respondent’s ease, there are persuasive reasons for concluding that Justice Souter’s powerful reasoning in Payton, rather than the majority's deferential review of a California court’s opinion, should guide our decision. In his dissenting opinion, Justice Souter pointed out that Payton’s trial had occurred both before the California Supreme Court had directed trial judges to supplement the factor (k) instruction and before the legislature had amended it. See 544 U. S., at 158. Without those changes, he correctly concluded, “any claim that factor (k) called for consideration of a defendant’s personal development in the wake of his crime was simply at odds with common attitudes and the English language.” Id., at 158-159.
*42 Moreover, Payton did not deal with a record that discloses actual confusion among jurors, as this record does. See supra, at 36-39. Nor did it involve a defense attorney who, bolstering the prosecutor’s claim that factor (k) did not allow the jury to consider respondent’s religious conversion, refused to “insult” the jury “by telling you I think [the mitigating evidence] excuses in any way what happened here,” App. 166. Therefore, even ignoring its significantly different procedural posture, Payton, like Boyde, falls far short of compelling the result that the Court reaches today.
VII
Instead of accepting that lay jurors would almost certainly give the words “circumstance which extenuates the gravity of the crime” their ordinary meaning, the Court insists that they would have disregarded their instructions and considered evidence that had nothing whatsoever to do with the crime. This conclusion seems to me to rest on an assumption that the jury had an uncanny ability to predict that future opinions would interpret factor (k) to mean something that neither the judge nor the lawyers thought it meant. Surely the more natural inference is that the jury followed its instructions. See Greer v. Miller, 483 U. S. 756, 766, n. 8 (1987) (describing our “presumption” that juries follow instructions).
The Court’s highly technical parsing of factor (k) depends on linguistic distinctions which would only occur to trained lawyers. See, e. g., ante, at 19 (calling attention to the “dichotomy within factor (k) . . . between a legal excuse and an extenuating circumstance”). And even the lawyers are confused. The prosecutor in Payton believed that “factor (k) d[oes] not permit consideration of postcrime rehabilitation evidence.” Ante, at 14. While the majority now blithely characterizes this view as “incorrec[t],” ante, at 13, it is the natural reading of factor (k), and one that jurors would have been likely to accept. Similarly, present-day *43 counsel for the State of California expressed confusion at oral argument as to whether it would have been constitutional for the trial judge to instruct the jury that it could not consider any mitigating evidence unless it extenuated the gravity of the crime, see Tr. of Oral Arg. 8-9 (retreating from the statement that “[i]t would appear not to be” constitutional). The Court cannot seriously insist that a group of 12 laypersons had such command of constitutional law that, anticipating Skipper, they took into account evidence outside the ambit of their jury instructions.
The Court also apparently believes that when the prosecutor in this case suggested that factor (k) meant exactly what it said, supra, at 32, the jury would have taken that as merely a comment on respondent’s credibility, ante, at 17. But this rests on a clear misreading of the record. Although the prosecutor did argue that respondent lacked sincere religious convictions, he also suggested quite powerfully that the law did not permit the jury to consider those convictions, however sincerely held. See App. 155 (“I don’t think the law contemplates that and I don’t think it’s right” (emphasis added)). Nor is there any support for the Court’s surprising and inherently contradictory view that while the prosecutor here “commented that the law did not contemplate jury consideration of respondent’s religious conversion,” ante, at 18, “[njothing the prosecutor said would have convinced the jury that it was forbidden from even considering respondent’s religious conversion,” ibid, (emphasis added).
Admittedly, as the Court points out, there is a distinction between limiting the jury’s consideration to “circumstancefs] of the crime” that extenuate its severity, and limiting that consideration to “any other circumstance that might excuse the crime,” see ante, at 15 (internal quotation marks omitted). It is highly unlikely, however, that jurors would note that subtle distinction, and even more unlikely that they would consider it significant. Both interpretations of the phrase focus the jury’s attention on the crime, and neither *44 includes the evidence at issue in Skipper, which “[ajlmost by definition . .. neither excuses the defendant’s crime nor reduces his responsibility for its commission.” 476 U. S., at 12 (Powell, J., concurring in judgment). Read however generously, the factor (k) limitation remains unconstitutional.
The Court makes a similarly unpersuasive argument based on the dubious premise that a juror would understand “remorse” to be a species of postcrime evidence that serves to lessen or excuse the crime itself. Even if that were true, it would not follow that jurors could somehow divine that respondent’s evidence of a capacity to redeem himself would both “extenuate his offense and render him less deserving of a death sentence.” Ante, at 16.[6]
VIII
Unless the jurors who imposed the death sentence somehow guessed at the breadth of the rule first announced in Lockett, that sentence was the product of an unconstitutional proceeding. Ironically, both Chief Justice Burger (who wrote the plurality opinion in Lockett) and Justice Powell (who joined it) understood the Lockett rule to extend only to evidence “that lessens the defendant’s culpability for the crime.” Skipper, 476 U. S., at 12 (Powell, J., joined by Burger, C. J., and Rehnquist, J., concurring in judgment). Given that the authors of Lockett themselves disagreed as to its scope, I am not as sanguine as the Court that the lay members of the jury somehow knew, notwithstanding clear jury instructions, that the testimony presented at the sen- *45 tenting phase of respondent’s trial could be part of the “simple weighing” the jury was supposed to undertake.
When the trial judge told the jurors to consider all the evidence “except as you may be hereinafter instructed,” App. 183, he directed them to limit their consideration to the traditional sentencing factors set forth in the statute. When the prosecutor told the jurors that “I don’t think the law contemplates” that respondent’s religion lessened the seriousness of respondent’s offense, id., at 155, he reinforced the impression that the jury should confine its deliberations to the listing. And once defense counsel agreed with the prosecutor, saying that “I’m not going to insult you by telling you I think [the mitigating evidence] excuses in any way what happened here,” id., at 166, surely at least some of the jurors would have doubted the propriety of speculating about respondent’s future conduct in prison as a basis for imposing a sentence less than death.
The Court today heaps speculation on speculation to reach the strange conclusion, out of step with our case law, that a properly instructed jury disregarded its instructions and considered evidence that fell outside the narrow confines of factor (k). Holding to the contrary, the Court insists, would reduce two days of sentencing testimony to “a virtual charade,” ante, at 13 (internal quotation marks omitted) — but in so concluding the Court necessarily finds that the judge’s instructions were themselves such a “charade” that the jury paid them no heed. I simply cannot believe that the jurors took it upon themselves to consider testimony they were all but told they were forbidden from considering; in my view, they must at the very least have been confused as to whether the evidence could appropriately be considered. That confusion has created a risk of error sufficient to warrant relief for a man who has spent more than half his life on death row. Cf. Lackey v. Texas, 514 U. S. 1045 (1995) (Stevens, J., respecting denial of certiorari). The incremental value to California of carrying out a death sentence at this late *46 date is far outweighed by the interest in maintaining confidence in the fairness of any proceeding that results in a State’s decision to take the life of one of its citizens. See Gardner v. Florida, 430 U. S. 349, 358 (1977) (plurality opinion).
Accordingly, I respectfully dissent.

 Those categories are:
“(a) The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true ....
“(b) The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence.
“(c) The presence or absence of any prior felony conviction.
“(d) Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.
“(e) Whether or not the victim was a participant in the defendant’s homicidal conduct or consented to the homicidal act.
“(f) Whether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct.
“(g) Whether or not defendant acted under extreme duress or under the substantial domination of another person.
“(h) Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect, or the affects of intoxication.
“(i) The age of the defendant at the time of the crime.
“(j) Whether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor.
*27 “(k) Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime.” Cal. Penal Code Ann. §190.3 (West 1988).
The 1988 version of § 190.3 also provided that “[a]fter having heard and received all of the evidence,. .. the trier of fact shall consider, take into account and be guided by the aggravating and mitigating circumstances referred to in this section,” and “shall determine whether the penalty shall be death or confinement in state prison for a term of life without the possibility of parole.”

 The California Legislature also responded to the confusion by amending factor (k) to include “any sympathetic or other aspect of the defendant’s character or record that the defendant offers as a basis for a sentence *28 less than death, whether or not related to the offense for which he is on trial.” Cal. Jury Instr., Crim., No. 8.85(k) (2005) (brackets omitted). That amendment confirms the view that the category of evidence that may provide the basis for a sentence other than death is much broader than the category described in factor (k).

 “JUROR HAILSTONE: If we can’t, Judge, what happens?
“THE COURT: I can’t tell you that.
“JUROR WILSON: That is what we wanted to know.
“THE COURT: Okay. I know what will happen, but I can’t tell you what will happen.
“MR. SCHICK: Maybe we should inquire whether the jury could reach a verdict.
■“THE COURT: Do you think, Mr. Norton, you will be able to make a decision in this matter?
“JUROR HAILSTONE: Not the way it is going.
“JUROR NORTON: That is tough, yes.
“THE COURT: Do you think if I allow you to continue to discuss the matter and for you to go over the instructions again with one another, that the possibility of making a decision is there?
“JUROR NORTON: I believe there is a possibility.
“JUROR HUCKABAY: We did need more time.
“THE COURT: I think so. I think you need more time.” App. 190-191.

 Skipper v. South Carolina, 476 U. S. 1, 4 (1986), recognized that a defendant’s potential good behavior in the future would not relate to his “culpability for the crime he committed.” Even the concurrence agreed: “Almost by definition,” it reasoned, a prisoner’s good behavior “neither excuses the defendant’s crime nor reduces his responsibility for its commission.” Id,., at 12 (Powell, J., concurring in judgment).

 When Juror Hailstone asked the judge about a particular piece of forward-looking evidence — the possibility that respondent would get psychiatric treatment in prison — the judge told the jury that it could not consider that evidence in making its decision. The judge’s answer, while legally correct, lent further support to the conclusion that respondent’s future conduct in a structured prison environment was not relevant because it did not fall within any of the listed factors.

 In response to the majority’s suggestion that this case may be inconsistent with Johnson v. Texas, 509 U. S. 350 (1993), ante, at 24,1 note only that Johnson addressed a very different question, namely, whether a jury considering future dangerousness could give adequate weight to a capital defendant’s youth. Whatever connection may exist between a defendant’s youth and his future dangerousness, there is no connection whatsoever between respondent’s evidence that he was capable of redemption and a “circumstance which extenuates the gravity of the crime,” Cal. Penal Code Ann. § 190.3(k) (West 1988).