[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-10621

_____

D.C. Docket No. 3:15-cv-00741-BJD-MCR

MARVIN TYRONE TARLETON,

Petitioner - Appellant,

versus

SECRETARY, FLORIDA DEPARTMENT
OF CORRECTIONS, et al.,

Respondents - Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(July 23, 2021)

Before ROSENBAUM, LUCK, and ANDERSON, Circuit Judges.

PER CURIAM:

Marvin Tarleton appeals the denial of his petition for writ of habeas corpus, brought under 28 U.S.C. § 2254.  He asserts the district court erred when it held that he was not prejudiced by his attorney's failure to object to the introduction of hearsay evidence and it erred when it denied his Confrontation Clause claim.  He also argues the district court erred when it denied his argument for cumulative error.

## I. FACTS AND PROCEDURAL HISTORY

Marvin Tarleton was charged with one count of unarmed robbery in state court in Duval County, Florida. The robbery occurred at a Bank of America branch where approximately $3500 was stolen.  The case proceeded to a jury trial on February 3, 2011.  The State called Elva Braho, the teller who was the victim of the robbery, who testified that at around 10:40 a.m., the perpetrator of the robbery approached her teller window.  Before he walked up to her window, she had not noticed him in the bank.  She testified that the perpetrator was a white male, with brown hair, brown eyes, and a clean-shaven face and was wearing a blue button-up shirt, hat, and thin-rimmed glasses.  She testified that he was approximately 5'8" tall and that he was in his early 40s.  When she spoke with law enforcement shortly after the robbery, she estimated the perpetrator's weight at 170 pounds and described him as "slim."  The perpetrator approached the window, placed a black

2

briefcase on the counter, and said, "I want 100s, 20s, and 50s" in a soft voice. The teller then provided the perpetrator with various currency without any tracking devices. He then turned and left the bank through the back door, at which point the teller triggered an alarm. The perpetrator was not wearing gloves and during the encounter, he touched both the counter and the briefcase containing the currency. Bank surveillance captured the encounter on video recording, which the State showed to the jury during the teller's testimony.

Approximately two weeks after the robbery, law enforcement showed the teller a photopack that contained photographs of six individuals, which included a picture of Tarleton. In her testimony at trial, Ms. Braho confirmed that when law enforcement showed her the photopack, she picked out the photo of Tarleton, and excluded the other five individuals in the photopack. She testified it was the eyes that gave it away more than anything else. As the surveillance video played for the jury, Ms. Braho pointed out the man in the video who robbed her. On cross-examination, Ms. Braho confirmed that she had not been able to positively identify for law enforcement any one of the six photos in the photopack. And when the person showing her the photopack showed her Tarleton's photo, she confirmed that, although she had picked out the photo because of the eyes, she told the officer

3

that she could not positively identify it as the person who robbed her.[1]  She also confirmed that the photo of Tarleton in the photopack was different from the perpetrator from the nose down; his chin was heavier, wider; his whole face was bigger.  She also testified that the photo of Tarleton was heavier than the perpetrator.

The State also called several of Tarleton's relatives.  A detective contacted Tarleton's stepmother, Joyce Tarleton, showed her two photographs, and asked her if she recognized the person in the photographs.  She identified Tarleton in one of the photographs but said she could not identify who the person in the other photograph was.  She testified that the shirt the person in the photograph was wearing looked like a shirt she had given Tarleton for Christmas.  She described the shirt as being blue, which matched the description by Ms. Braho of the blue shirt worn by the perpetrator.  On cross-examination, she acknowledged that she gave the shirt to Mr. Tarleton at least four Christmases prior because she had had little contact with Mr. Tarleton in the past four years.  Afterwards, Joyce Tarleton

---

[1]     The question in cross-examination was: "And, in fact, you told the person showing you that photo spread no to the picture of Marvin Tarleton; is that correct?"  Answer: "Because he said, Are you positive?  I said, No."  Doc. 18-2, at 295, lines 9-12.

called some relatives and non-relatives "to try to confirm what [she was] suspecting." At trial, she testified that she was "pretty sure" that the person in the photograph was Tarleton and that she believed the person in the surveillance video was also he. She testified that the briefcase that the person in the bank was carrying looked like a briefcase Tarleton's father had. On cross-examination, Joyce Tarleton testified that Tarleton's father passed away in 2007. She confirmed that, shortly before his passing, she had a dispute with Tarleton and his sister and since that time, had had little contact with Tarleton. She testified that she had told Tarleton and his sisters not to have contact with her.

Ashley Hoffman, Joyce Tarleton's granddaughter, was also called by the State. She testified that her grandmother called her one day and told her to look up news coverage of the robbery. Hoffman testified that she did so and then recognized Tarleton as the purported suspect shown in the pictures in the news coverage. She testified at trial that she recognized the smile, the briefcase, the trucker-style hat, and the shirt that the suspect was wearing. She also testified on cross-examination that she had not seen Mr. Tarleton in the last four years, since she was 16 years old.

The State called Franchesca Swierz, Tarleton's ex-wife, who testified she had been approached by a detective, shown a photograph, and asked if she

5

recognized the person depicted therein. She responded that it looked like her ex-husband. She also testified that the person in bank surveillance video looked like her ex-husband.[2] Swierz and Tarleton divorced in 2001, however, and she had not seen, nor had any contact with him since 2003 or 2004, "almost a decade" earlier.

Jacksonville Sheriff's Office Detective James Venosh, Jr. testified that upon responding to the scene, he had patrol officers canvas the area and deployed K-9s to search for the suspect. Law enforcement was not able to find a suspect or any information helpful to the investigation. He released pictures from the bank surveillance to the media in the hope of finding a suspect, and on November 22, the detective received two crime stopper tips. One of the tips was that the suspect was a person named Robin Zidberry, but he ruled out Zidberry after examining photos of him, and Zidberry had green eyes, while the bank teller said the perpetrator had brown eyes. The other anonymous crime stoppers tip was that the suspect may have been Tarleton, and after reviewing pictures of Tarleton, the

---

[2]    The detective who investigated the robbery, James Venosh, Jr., testified about having shown the photo and surveillance video to Swierz. "She was fairly sure when I showed her the photograph, but she said she wasn't 100 percent positive. She asked if she could see the movie video and she would be able to tell me 100 percent. She viewed that and, when she saw it, she said, Absolutely, that is him." Doc. 18-3, at 16, lines 8-12.

6

detective opined that there were "strong similarities" between Tarleton and the suspect.

He created a photopack that contained a picture of Tarleton, which he showed to the bank teller, Ms. Braho, and two other bank employees who were present on the day of the robbery. Only Ms. Braho had a good look at the perpetrator. She picked out the picture of Tarleton as looking very similar to the suspect; the facial features and eyes looked very similar. But because he looked larger in the photo than the person she remembered, she "didn't feel it was possibly the same person." Overall, the detective's testimony suggests that he believed Ms. Braho had identified Tarleton, although the differences prevented her from making a positive identification.[3]

The detective testified that he then showed the photopack to the stepmother, Joyce Tarleton. After Joyce Tarleton identified Tarleton as the person in the

---

[3]     The detective was asked at that point: "So her ID was basically on eyes and face?" Answer: "Correct . . . Overall facial features is what she told me." Doc. 18-2, at 346, lines 5-8. See also Doc. 18-3, at 5, lines 13-15 (the detective was asked on cross-examination: "Yet when you brought [Ms. Braho] the photo spread she was not able to positively identify Martin Tarleton?" Answer: "Not positively, no.").

7

surveillance, the detective had Tarleton arrested. At the time of his arrest, Tarleton was 40 years old, 5'8" tall, and weighed 200 pounds.

The detective testified that he showed the bank surveillance to one of Tarleton's sisters, Angela Tarleton. Angela cried when she viewed the photo and told him that she could not be sure, but that the person looked like Tarleton. After viewing the photo, Angela gave the officer permission to search her home, where Tarleton had been residing prior to his arrest. Law enforcement found no potential evidence during that search.

A vehicle Tarleton had been driving was also later searched and no evidence was found in it. The detective testified that he found no evidence of Tarleton having made any extravagant purchases after the robbery occurred. The detective showed the surveillance photo to another of Tarleton's sisters, Kimberly McClenton, who testified that she did not recognize the person in the photo.

The detective showed the surveillance photo to another niece of Tarleton's by marriage, April Hoffman. The detective stated at trial that April said she recognized the person in the photo as her uncle but that she did not wish to be involved in the investigation.

A DNA sample from Tarleton was compared to DNA samples collected from the bank counter, and Tarleton was excluded as a contributor of any of the

8

DNA samples obtained from the counter. Tarleton's fingerprints were compared to latent prints recovered from the bank entry/exit door and Tarleton was excluded as a match to any of the latent prints.

On cross-examination, defense counsel asked the detective if he also showed the photo to Tarleton's brother, James. He testified that James could not "positively identify" Tarleton as the suspect. On redirect examination, however, the detective testified that James told him that the suspect in the photo looked like his brother, but he could not be sure that it was. The detective testified on redirect that he also showed James's wife the surveillance photo and she said that the person in the photo could be Tarleton.

Angela Tarleton later testified as a defense witness and stated that she did not recognize the person in the surveillance photo as her brother. She testified that she cried when she was shown the photo by the detective because she feared that she would be evicted from her public housing.

In closing arguments, the State relied on the detective's testimony about the three non-testifying family members. The State argued: "April Hoffman said that she recognized the suspect in the surveillance photograph as Ty Tarleton. She did not want to sign it because she did not want to get involved with the investigation. That is still an identity. That is still her identifying Ty Tarleton as the person in

9

those photographs, the same person that robbed the bank on December 16, 2009."

It later told the jury to remember what those non-testifying family members said

"when the defense gets up here and says and argues to you that the only people that

are identifying Marvin Tyrone Tarleton are people that have something to gain."

During deliberations, the jury asked two questions:

1) When was photo (mugshot) JPICS ID 1148849 taken?
2) Can we get sequential order of when all photos were taken?

The court replied, "the only answer I can give you, is that you will have to rely on

your individual and collective memories of the evidence that you saw and heard

and make your decision based on that."

Tarleton filed pro se motions for mistrial/new trial and for judgment of

acquittal.  At the hearing on the motion for new trial, Tarleton argued the issue of

having been denied an opportunity to cross-examine the various witnesses who did

not testify but whose out-of-court statements were admitted.  The state circuit court

informed Tarleton that it had ruled on the matters, that it was now up to the

appellate court to address the issues, and it denied the motions.  On March 10,

2011, the court sentenced Tarleton to 30 years' imprisonment.  Tarleton appealed

to the First District Court of Appeal of Florida, which issued a per curiam

10

affirmance on August 13, 2012.  Tarleton v. State, 94 So. 3d 589 (Fla. 1st DCA 2012).

On November 26, 2012, Tarleton filed in the First District Court of Appeal a petition for a writ of habeas corpus asserting ineffective assistance of appellate counsel.  The court denied that petition without discussion.  Tarleton v. State, 103 So. 3d 272 (Fla. 1st DCA 2012).  On January 29, 2013, Tarleton filed in the state circuit court a motion for post-conviction relief pursuant to Florida Rule of Criminal Procedure 3.850.  He later filed an amended motion with leave of the court.  The motion raised six total claims, which included, for purposes of this appeal:

> (1) ineffective assistance of counsel for failure to object to inadmissible hearsay from non-testifying witness April Hoffman;
> (2) ineffective assistance of counsel for failure to object to inadmissible hearsay from the crime stopper tipster;
> (3) ineffective assistance of counsel for failure to object to inadmissible hearsay from Tarleton's brother;
> (4) ineffective assistance of counsel for failure to object to inadmissible hearsay from Tarleton's sister-in-law; and
> (6) ineffective assistance of counsel based on the cumulative effect of the errors and omissions of counsel presented in grounds one, two and three.

The court denied relief on all grounds.

11

The court did make a finding that "the record does not reflect that Defendant had a prior opportunity to cross-examine April Hoffman." While addressing ground one, the state circuit court specifically found

> [o]ne of the witnesses who identified the robber was the victim, the Bank of America teller. The victim testified at trial that she had identified Defendant from a photo spread approximately two weeks after the robbery. (Ex. E at 166, 168-76.) During trial, the victim also identified Defendant as the individual who robbed her, from the photo spread, and the jury was shown the photograph that the victim selected. (Ex. E at 176-79.) Further, Defendant's stepmother, niece, and ex-wife identified Defendant as the individual who had robbed the Bank of America on November 16, 2009, at trial. (Ex. E at 188-89, 191-96, 206-21.)

The court further observed that the jury viewed the bank surveillance video and still photos and Tarleton's booking photograph from his arrest. Although the court found that April Hoffman's testimony was hearsay, it held that

> Ms. Hoffman's statements are inconsequential and far from damaging when considering the testimony presented at trial in its entirety. The testimony of the four witnesses at trial who identified Defendant as the robber - including that of the victim - provided much more in the way of near overwhelming evidence that Defendant was the robber, than the few references to Ms. Hoffman's statements made during the course of the Defendant's trial.

Similarly, the state court found, and the State conceded, that the detective's testimony about the crime stopper tip was inadmissible hearsay. Relying on the same evidence it relied on in denying relief on the April Hoffman ineffective

12

counsel issue, the court found that prejudice was not established from the admission of the out-of-court statements of the crime stopper tipster, the brother, and the sister-in-law.  Finally, the state court denied the cumulative error issue, reasoning that "[b]ecause all of Defendant's grounds for relief have been denied, Defendant's claim of cumulative error must be similarly rejected."  Tarleton appealed to the First District Court of Appeal, who again issued a per curiam affirmance on October 3, 2014.  Tarleton v. State, 151 So. 3d 1239 (Fla. 1st DCA 2014).

On June 19, 2015, Tarleton filed in the United States District Court for the Middle District of Florida, Jacksonville Division, a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The motion raised as grounds relevant to this appeal:

> (1) ineffective assistance of counsel for failure to object to inadmissible hearsay from non-testifying witness April Hoffman; (2) ineffective assistance of counsel for failure to object to inadmissible hearsay from non-testifying witnesses James and Nynce Tarleton; (3) ineffective assistance of counsel for failure to object to inadmissible hearsay from non-testifying crime stoppers' witness; (4) ineffective assistance of counsel based on the cumulative effect of the errors and omissions of counsel presented in grounds one, two and three; . . . and (6) a Sixth Amendment Confrontation Clause claim based on Detective John Venosh's testimony that non-testifying witness April Hoffman identified Petitioner as the perpetrator of the crime after Ms. Hoffman viewed photographs taken during the robbery.

13

The district court addressed the first three claims together. First, the district court noted that the state court had properly referenced the Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984), standard, and noted that its standard for prejudice in this context asked if there was a reasonable probability that a different jury verdict would have resulted. Specifically, in the hearsay context, the state court had asked the proper question of whether the introduction of the hearsay evidence as corroborative evidence "'was profoundly damaging'" and the non-hearsay evidence was "'far from overwhelming.'" The district court noted that the state court found all three to be inadmissible hearsay but that Tarleton had not established prejudice. This conclusion, the district court stated, was based on the state court's reliance on the "substantial impact" of the four witnesses who actually testified at trial and who identified Tarleton as the perpetrator in the bank's surveillance videotape and still shots. The district court acknowledged that the trial court "liberally construed the testimony of Elva Braho" when it stated that she identified the robber but stated that there was "certainly" strong testimony from Braho describing the robber and verifying that she selected Tarleton from the photospread. The district court also noted that the trial court relied on the three witnesses who identified Tarleton from the photos and on the jury's own viewing of the video and stills as well as Tarleton's photo taken during the booking process.

Given this evidence, the trial court found no prejudice and the district court held that this decision was not inconsistent with Strickland.  Further, because there was a qualifying decision by the state court, the district court held that deference must be given.

Ground Four was the cumulative error claim and the district court rejected it because the none of the grounds for claiming ineffective assistance of counsel provided a basis for relief, so the cumulative effect did not provide the foundation for granting habeas relief.  It cited the state court for a similar holding and held that decision entitled to deference.  Ground Six was the Crawford[4] claim based on the detective's statement about April Hoffman's identification of Tarleton.  First, the court held that Tarleton had not procedurally defaulted the claim because he included two sentences about it in his direct appeal, and the reference to Crawford put the state appellate court on notice that the Confrontation Clause was involved.  Because the First District Court of Appeal affirmed per curiam, the district court presumed that it adjudicated the claim on the merits because there was no indication that procedural grounds existed.  The petitioner, the district court held,

---

[4]    Crawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354 (2004).

15

failed to demonstrate that there was no reasonable ground for the presumed rejection of the claim. The court returned to the prejudice analysis and determined the error was harmless.

This Court granted a Certificate of Appealability on three issues:

Whether Mr. Tarleton is entitled to habeas relief on his claims that trial counsel rendered ineffective assistance of counsel by failing to object, on Confrontation Clause and state law grounds, to the admission and use of hearsay statements from three non-testifying witnesses—April Hoffman, James Tarleton, and Nynce Tarleton—and an anonymous tipster;

Whether Mr. Tarleton is entitled to habeas relief on his claim that the trial court erroneously admitted April Hoffman's out-of-court statements in violation of his rights under the Confrontation Clause;

Whether Mr. Tarleton is entitled to habeas relief on his claim that the errors listed in grounds (1) and (2) cumulatively denied him the right to a fair trial in violation of the Sixth Amendment.

## II. DISCUSSION

A. <u>Ineffective Assistance of Counsel–Admission of Hearsay Statements</u>

Tarleton argues that the district court erred when it accepted the state court's conclusion of no prejudice when his attorney failed to object to the introduction of hearsay statements from three declarants. He argues that the court based this conclusion on the state court's unreasonable fact finding that the bank teller identified Tarleton as the perpetrator and reliance on three witnesses who viewed

16

the surveillance video and stated the person was Tarleton despite not having seen him for several years. Tarleton also points to physical evidence such as DNA and fingerprints that excluded him. The evidence, when properly construed, he argues, was not overwhelming.

Under well-established law, a person in custody pursuant to a state court judgment cannot be granted habeas relief in federal court on a claim that was "adjudicated on the merits in State court proceedings" unless the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or unless the state court decision "resulted in a decision that was based on an unreasonable determination of facts in light of the evidence presented in the state court proceeding," § 2254(d)(2). The primary focus of Tarleton's attempt to avoid the preemptive force of § 2254 with respect to his ineffective assistance of counsel claim relies on § 2254(d)(2) and his argument that the Rule 3.850 judge's rejection of his claim was an unreasonable determination of the facts because that judge unreasonably found that the bank teller, Ms. Braho, identified Tarleton as the perpetrator. Tarleton also argues that the Rule 3.850 judge made an unreasonable application of the clearly established Strickland law. His argument in that regard relies primarily on his view that the Rule 3.850 judge unreasonably

17

found that Ms. Braho had identified him, but he also argues that the several hearsay errors were prejudicial and contributed to making the state court decision an unreasonable application of Strickland's prejudice prong.

A state court decision involves an "unreasonable application" of Supreme Court precedent if the state court correctly identifies the governing legal principle but applies it to the facts of the petitioner's case in an objectively unreasonable manner. Brown v. Payton, 544 U.S. 133, 141, 125 S. Ct. 1432, 1439 (2005). In such a case, the decision must be more than incorrect or erroneous—it must be "objectively unreasonable." Lockyer v. Andrade, 538 U.S. 63, 75, 123 S. Ct. 1166, 1174 (2003). Thus, to prevail the petitioner must show that the state court's ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington v. Richter, 562 U.S. 86, 103, 135 S. Ct. 770, 786-87 (2011).

In applying § 2254(d)(2)—a decision based on an unreasonable determination of the facts in light of the evidence in the state court proceedings—the Supreme Court "requires that we accord the state trial court substantial deference." Brumfield v. Cain, 576 U.S. 305, 314, 135 S. Ct. 2269, 2277 (2015). "If '[r]easonable minds reviewing the record might disagree about the finding in

18

question, on habeas review that does not suffice to supersede the trial court's . . . determination.'" Id. (alteration and ellipsis in original) (quoting Wood v. Allen, 558 U.S. 290, 301, 130 S. Ct. 841, 849 (2010)).

In order to prevail on an ineffective assistance of counsel claim, a habeas petitioner must show both that his counsel's performance was deficient and that counsel's deficient performance prejudiced him. Strickland, 466 U.S. at 687, 104 S. Ct. at 2064. To prove prejudice under Strickland, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694, 104 S. Ct. at 2068. A "reasonable probability" does not mean that counsel's performance "more likely than not altered the outcome." Nix v. Whiteside, 475 U.S. 157, 175, 106 S. Ct. 988, 998 (1986). Rather, a "reasonable probability" is a "probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068. Further, the burden is heavier still when a federal court is reviewing a state court:

> As difficult as it is to prevail on an ineffective assistance prejudice issue in the first court to decide it, the Antiterrorism and Effective Death Penalty Act of 1996 makes it even harder to succeed on that issue in a federal habeas proceeding after a state court has ruled that the petitioner failed to show prejudice. To obtain habeas relief, the petitioner must show that the state court's ruling "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

19

established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). That is a highly deferential standard that is intentionally difficult to meet. . . .

To overcome AEDPA deference under § 2254(d)(1), the petitioner must "show that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." [Virginia v. LeBlanc, 582 U.S. __, 137 S. Ct. 1726, 1728 (2017)] "[I]f some fairminded jurists could agree with the state court's decision, although others might disagree, federal habeas relief must be denied." Holsey v. Warden, Ga. Diagnostic Prison, 694 F.3d 1230, 1257 (11th Cir. 2012).

Meders v. Warden, Ga. Diagnostic Prison, 911 F.3d 1335, 1348-49 (11th Cir. 2019) (footnote omitted) (internal quotations and citations omitted).

We agree with the district court that the conclusion of the Rule 3.850 state court that Tarleton could not show prejudice under the Strickland standard was neither an unreasonable application of Supreme Court precedent nor an unreasonable determination of the facts. Undertaking the § 2254(d)(2) inquiry first, and applying that deferential standard of review, we cannot conclude that the Rule 3.850 court's statement that Ms. Braho identified Tarleton as the perpetrator was an unreasonable determination of fact in light of the evidence presented in state court. She testified that the perpetrator was 5'8", clean-shaven, wore glasses, and that she got a good look at his eyes. She testified that she picked Tarleton's photo out of the photospread two weeks after the robbery because "[i]t was the

20

eyes that gave it away more than anything else," while conceding that enough time had passed that she was not sure that she could recognize the person who robbed her. At trial, she again selected the photo of Tarleton as "the photograph that depicts the individual that had the eyes that you were talking about." She then watched the video and narrated, with the questions from the prosecutor, what happened. On cross-examination, she conceded that she had described the perpetrator as "slim" to the detectives and as weighing about 170. She also conceded that she had told the detective that she was not positive in her identification of Tarleton. She thought the photo had the same eyes, but looked heavier, and the face and chin in the photo looked heavier and wider from the nose down. While certainly this is not an unequivocal identification of Tarleton as the perpetrator, her confidence about the eyes came through in the testimony. And she picked out Tarleton's picture from the photopack while excluding the other five. Although she admitted on cross-examination that she could not be positive about her identification, and although she noted some differences, we cannot conclude that a reasonable jurist might not deem her testimony an identification. Even if "reasonable minds reviewing the record might disagree about the finding in

21

question, on habeas review, that does not suffice to supersede the trial court's . . . determination." Brumfield, 576 U.S. at 314, 135 S. Ct. at 2277 (cleaned up).[5]

Second, we undertake the § 2254(d)(1) inquiry—whether the state court decision involved an unreasonable application of clearly established law as determined by the Supreme Court of the United States. We have examined the evidence—the trial witnesses (i.e., the testimony of Ms. Braho, the stepmother Joyce Tarleton, Ashley Hoffman, and the ex-wife Swierz), as well as the video and still photos which the jury itself viewed—and we have compared that evidence to the weak, cumulative hearsay that Tarleton challenges. We cannot conclude that the Rule 3.850 court's decision—that there was not a reasonable probability that the result would have been different if the hearsay evidence had been challenged and excluded—was an unreasonable application of clearly established federal law. We discussed above the testimony of the victim-teller Ms. Braho. The three

---

[5] We follow the Supreme Court in Wood, 558 U.S. at 301, 130 S. Ct. at 849, and assume arguendo but decline to decide, that "the factual determination at issue should be reviewed . . . only under § 2254(d)(2) and not under § 2254(e)(1)." Because the Rule 3.850 judge's determination of the factual issue challenged by Tarleton "was not an unreasonable determination of the facts in light of the evidence presented in the state court proceedings[,] [w]e therefore do not need to decide whether that determination should be reviewed under the arguably more deferential standard set out in § 2254(e)(1)." Id.

relatives who testified at the trial—Joyce Tarleton, Ashley Hoffman, and Franchesca Swierz—provided strong evidence that Tarleton was the man in the surveillance video and still photos derived therefrom.  Joyce Tarleton, his stepmother, had known Tarleton since childhood, and was "pretty sure" that Tarleton was the man in the surveillance video and stills.  She recognized the briefcase he carried and the blue shirt he wore.  Ashley Hoffman testified that she recognized Tarleton as the perpetrator in the news coverage of the robbery.  She testified that she recognized Tarleton in the surveillance video, and she recognized his smile, the briefcase, the trucker-style hat, and his shirt.  Tarleton's ex-wife, Swierz, identified Tarleton as the perpetrator, testifying that the person in the surveillance video looked like Tarleton, and told the detective that "it absolutely was him."

By contrast, the detective's report of the hearsay declarants was equivocal and not likely to have had a significant impact on the jury.  Tarleton's brother James merely told the detective that the photo looked like Tarleton but he was not sure.  The report with respect to James' wife was similar.  Although April Hoffman told the detective she recognized Tarleton, she said she did not want to be involved and she provided no details or reasons that might make her testimony influential with the jury.  Unlike trial witnesses Joyce Tarleton and Ashley Hoffman, she

23

mentioned recognizing no details like the briefcase, the blue shirt, or the smile that would tend to make her testimony persuasive to the jury. With respect to the crimestopper's tip, the jury likely surmised that came from one of the trial witnesses, and it would not have had much impact on the jury. By contrast, strong evidence was properly before the jury in the form of the three trial witnesses who identified persuasive reasons why their recognition of Tarleton was sound and whose association with Tarleton was extensive and intimate (at least with respect to his stepmother, Joyce Tarleton, and ex-wife, Swierz). Significantly, there was also the strong evidence of the surveillance video itself, as well as the still photos, which the jury viewed. The jury could make its own identification, comparing the photos and video to Tarleton. From the jury questions about the photos after deliberations began, it is clear that the photos were viewed as significant evidence by the jury.

In short, the hearsay testimony challenged by Tarleton was brief and cumulative, and weak in comparison to the evidence properly submitted to the jury from the trial witnesses and the surveillance video and stills. Especially in light of our narrow standard of review pursuant to § 2254(d)(1), we cannot conclude that the state court decision—that Tarleton has not shown there was a reasonable probability of a different result if the hearsay evidence had been challenged and

24

excluded—was an unreasonable application of clearly established federal law. The Rule 3.850 judge correctly identified the governing legal principle—Strickland v. Washington—and her application of Strickland to the facts was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103, 135 S. Ct. at 786-87.

### B. Confrontation Clause

Tarleton argues that the detective's hearsay testimony relating what April Hoffman said violated the Confrontation Clause because the declarant's statements were testimonial statements made in anticipation of litigation because they were made to law enforcement during an investigation.[6] Further, the State did not establish that the declarant was unavailable for testimony. Tarleton argues that the district court erred as a matter of law in finding that the state courts' denial of the claim was not contrary to or an unreasonable application of Crawford.

---

[6]   We granted a certificate of appealability with respect to only one Confrontation Clause claim—detective Venosh's testimony that April Hoffman told him that the bank's surveillance photo looked like Tarleton but that she did not want to get involved.

25

The State replies that this issue was not exhausted and thus is procedurally barred.  We agree with the district court that Tarleton exhausted this claim.  In Taylor v. Secretary, Florida Department of Corrections, 760 F.3d 1284, 1295 (2014), we deemed a claim fairly presented when the petitioner stated he was entitled to introduce testimony under the Sixth Amendment and twice cited to Chambers v. Mississippi, 410 U.S. 284, 93 S. Ct. 1038 (1973).  Here, Tarleton argued, in his initial brief on direct appeal from the state court's judgment, that admission of the detective's testimony about April Hoffman violated the Confrontation Clause, with a reference to Crawford.  This is sufficient, under Taylor, to have raised the claim with respect to April Hoffman's statement.  However, the First District Court of Appeal rejected Tarleton's direct appeal per curiam (i.e., without opinion).

There is no indication that any state court addressed this issue and stated reasons for rejecting it.  "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."  Richter, 562 U.S. at 99, 131 S. Ct. at 784-85.  Only if there is reason to believe another explanation for the state court's decision is more likely can this presumption be overcome.  Id. at 99-100, 131 S.

26

Ct. at 785. Tarleton argues the instruction in the recent Supreme Court case Wilson v. Sellers, __ U.S. __, 138 S. Ct. 1188 (2018)—that we "look through" to the last related case that provided a relevant rationale—means that because there is no such relevant case, we cannot defer to a presumed state court decision. However, the Court expressly rejected that argument in Wilson, distinguishing Richter because in that case, "there was no lower court opinion to look to." __ U.S. at __, 138 S. Ct. at 1195. As in Richter, in this case too, there was no lower court decision to look to because there was no contemporaneous objection and thus no ruling by the trial judge. Accordingly, we follow the instruction in Richter and assume an on-the-merits ruling by the First District Court of Appeal. [7]

Tarleton thus finds himself in the following situation. His Confrontation Clause claim was rejected on the merits by the First District Court of Appeal, and there has been no statement of reasons by any state court for rejecting the claim.

---

[7]    Following Richter, the district court presumed that the First District Court of Appeal rejected Tarleton's Confrontation Clause claim on the merits, holding that there was "an absence of any indication or state law procedural principles to the contrary." D.C. opinion, Docket 21, at 25-26. Tarleton does not challenge the district court's holding that the state appellate court ruled on the merits and not on the basis of a procedural default, and thus has waived any such challenge. Of course, Tarleton would have no incentive to prefer procedural default to a ruling on the merits because Tarleton could not satisfy the cause and prejudice requirement to overcome the procedural bar which would have faced him in federal habeas court.

27

Under Richter, Tarleton's burden is to demonstrate that there was no reasonable basis for the decision of the First District Court of Appeal to deny his claim. See Richter, 562 U.S. at 98, 131 S. Ct. at 784 ("Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief.").

Tarleton cannot satisfy this burden because the First District Court of Appeal could reasonably have concluded that the admission of the detective's hearsay testimony of what April Hoffman told him was harmless error. In evaluating whether there was a reasonable basis for the state court decision, we apply the standard enunciated in Brecht v. Abrahamson, 507 U.S. 619, 637, 113 S. Ct. 1710, 1722 (1993), which held that error is harmless unless it "had substantial and injurious effect or influence in determining the jury's verdict."[8] "Under this standard, habeas petitioners may obtain plenary review of their constitutional

---

[8]    See Fry v. Pliler, 551 U.S. 112, 121-22, 127 S. Ct. 2321, 2328 (2007) ("We hold that in § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in Brecht, supra, whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in Chapman[ v. California], 386 U.S. 18, 87 S. Ct. 824 [(1967].").; Raheem v. GDCP Warden, 995 F.3d 895, 937 (11th Cir. 2021).

claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" Id. This Tarleton cannot do.

As discussed above, the hearsay attributed by the detective to April Hoffman was not only cumulative to, but was also much weaker than, the strong evidence provided by the three trial witnesses and the photos and surveillance video that the jurors themselves could compare to the defendant Tarleton sitting before them. April's brief comment not only expressed lack of interest, but also was accompanied by no reasons or details that might have made her opinion influential with the jury. By contrast, the testimony of the three trial witnesses was accompanied by numerous details that would have made their identification of Tarleton persuasive to the jury. Also, there is no indication that April Hoffman had an extensive association with Tarleton as had his stepmother, Joyce Tarleton, or an intimate association as had the ex-wife, Swierz. And it is hard to imagine that April's brief comment had much impact on the jury which had the surveillance video and still photos to compare to Tarleton himself. It is not only probable that the video and photos were the most powerful evidence before the jury, we actually know from the jury's questions that they were foremost in the minds of the jurors.

We cannot conclude that no "fair-minded jurists" sitting in the shoes of the First District Court of Appeal on Tarleton's direct appeal could have concluded

29

that the Confrontation Clause claim was harmless.  Richter, 562 U.S. at 101, 131

S. Ct. at 786.  Accordingly, we cannot conclude that Tarleton has met his burden

under Richter to show that "there was no reasonable basis for the state court to

deny relief."  Id. at 98, 131 S. Ct. at 784.

## C.  Cumulative Error

Tarleton argues that the cumulative effect of these incidents of ineffective

assistance of counsel and violation of the Confrontation Clause prejudiced him and

warrant vacating his conviction.  The State argues that cumulative error is not a

cognizable claim in federal habeas petitions because the Supreme Court has not

held that distinct constitutional claims can be aggregated.

In this case, we need not reach the issue of whether cumulative error is

cognizable in habeas proceedings.  We can assume arguendo, although we

expressly do not decide, that the prejudicial effect of Tarleton's alleged errors can

be aggregated.  Tarleton presented three hearsay ineffective assistance of counsel

incidents together with one Confrontation Clause argument that all had very weak

prejudicial effect on the jury.  However, as discussed more fully above, we cannot

conclude that Tarleton can satisfy his burden of avoiding the preemptive effect of

the state court decisions and of establishing prejudice.

## III. CONCLUSION

For the foregoing reasons, we reject Tarleton's § 2254 petition.  The

judgment of the district court is

AFFIRMED.

ROSENBAUM, Circuit Judge, concurring in part and dissenting in part:

Marvin Tarleton is spending 30 years in prison after a jury found he stole $3,429 from a Bank of America branch.  But the admissible evidence against him was so underwhelming that the State apparently felt it had to rely on inadmissible hearsay evidence from *three* witnesses it could have chosen to subpoena (but didn't) to convict him.  And Tarleton's lawyer did not object to a lick of it.  In my view, this ineffective performance and the resulting admission of the inadmissible hearsay evidence seriously "undermine[s] confidence in the outcome," *Strickland v. Washington*, 466 U.S. 668, 694 (1984), of Tarleton's trial, and the state court's conclusion to the contrary represents an unreasonable determination of facts.  I would therefore find prejudice and grant the habeas petition on Tarleton's *Strickland* claim.[1]

## I.

To prove ineffective assistance of counsel under *Strickland*, Tarleton must show that (1) his counsel's performance was deficient and (2) he was prejudiced as a result.  *Strickland*, 466 U.S. at 687.  Here, everyone assumes that Tarleton's counsel performed deficiently; the sole issue is whether Tarleton was prejudiced.

---

[1] I concur in the panel's holding that Tarleton is not entitled to relief on his Confrontation Clause and cumulative-error claims.

32

When we apply the proper standard of Antiterrorism and Effective Death Penalty Act ("AEDPA") deference here, counsel's error prejudiced Tarleton. For starters, there wasn't much admissible evidence against Tarleton at trial: Though the State collected DNA and a fingerprint from the scene, Tarleton was excluded as a possible match from each bit of material tested. Though the State searched Tarleton's residence twice and the vehicle he drove once, it found no evidence at all to connect Tarleton to the crime. Though three eyewitnesses saw the robbery occur, two could not identify Tarleton at all as the robber, and a third (bank teller Elva Braho) who selected Tarleton from a photo lineup based on his eyes admitted she was "not able to positively identify anyone." And though the robber stole $3,429 and the State did not recover any of that money, the State presented no evidence that Tarleton ever spent a penny of it. To the contrary, Tarleton's sister Angela testified that, after the robbery, the power company turned off the electricity at Tarleton's and her residence for failure to pay the electrical bill.

In all, the only admissible evidence positively tying Tarleton to the robbery was the photo identification three of Tarleton's estranged relatives made of the pictures below, taken from the surveillance footage of the robbery, which, along with the stills were provided to the jury:

33





But at least one of these three estranged relatives—Joyce Tarleton, who was Tarleton's stepmother, did not much like Tarleton. In fact, she admitted that after Tarleton's father (her husband) died (more than two years before she originally identified Tarleton as the robber and more than four years before she testified against Tarleton), she did not want Tarleton in her house, and she told him to "stay away" from her. A second of these identifying witnesses—Ashley Hoffman, Joyce

34

Tarleton's granddaughter and Tarleton's niece by marriage—also conceded that she "did not have a close relationship" with Tarleton and described Tarleton as "technically" her uncle. As for the third of these identifying witnesses—Franchesca Swierz—she was Tarleton's ex-wife, and she had not seen Tarleton for "almost a decade" when she identified him from the surveillance photos.

And that's it. That is the totality of the admissible evidence that the State presented against Tarleton. True, this evidence would have been enough to sustain a guilty verdict, had a jury reached that decision based on only this evidence. But that's not what happened. And a guilty verdict was nowhere near certain based on this meager evidence alone. Contrary to the state trial court's unreasonable conclusion, this was no "near overwhelming evidence." Rather, it left a lot of room for reasonable doubt.

Even the State was apparently concerned with its admissible evidence because it bolstered its case by eliciting from Detective Venosh inadmissible hearsay evidence. Then in closing, the State relied heavily on those hearsay statements to convince the jury to return a guilty verdict.

More specifically, Venosh testified that April Hoffman, another of Tarleton's stepnieces, identified the man in the surveillance photos as Tarleton, but she refused to sign the photo and said she did not wish to be involved in the investigation.

35

Venosh also testified that James (Tarleton's brother) and his wife both said that the surveillance pictures "could be" Tarleton.

These hearsay identifications came in handy during the State's closing, when it argued that James Tarleton's wife "said [the man in the surveillance photo] was possibly . . . Tarleton[—]another family member who also provides identification of this man. How about James Tarleton, his brother, stated that he looked like he could be his brother. *His whole family is identifying this man*." (emphasis added). And just to be sure his reliance on the hearsay evidence hit its mark, the State prosecutor continued, "The people who know him best are telling the police, are telling the sheriff's office and even taking the stand and telling y'all. They know who this man is. They knew who that man is."

The State even used the hearsay evidence to help respond directly to the defense's contention that the three estranged relatives who testified against Tarleton had an ax to grind: the prosecutor remarked, "So keep in mind, members of the jury, when the defense gets up here and says and argues to you that the only people that are identifying . . . Tarleton are people that have something to gain[,] [w]ell, that is

36

not necessarily true when you take into consideration what Angela Tarleton,[2] a defense witness, had to say[;] [w]hen you take into consideration what James and [his wife] and April [Hoffman] had to say as well."

These arguments were not incidental to the State's closing arguments;  they were central ingredients to the theme of it—that Tarleton was identified from the surveillance photos by "[h]is whole family."  The implication of this theme is clear: even if the jurors thought the three estranged relatives who testified at trial might have been biased, that didn't matter because other family members sealed the deal. The State's emphasis of this inadmissible hearsay evidence from three different witnesses in its closing arguments shows that even the State recognized the power of that evidence.  So in my view, a simple review of the trial transcript reveals that counsel's ineffective assistance in failing to object to the evidence and its use was not harmless.  And that's enough to undermine confidence in the outcome here.

---

[2] Tarleton called Angela Tarleton, his sister, as a witness in his case.  She testified that when she was shown the surveillance photo of Tarleton, she told the officer that "it favored him, but it did not look like him to me."  To remove any question, she also testified that she was "100 percent" sure it was not Tarleton.

37

But for extra measure, I note that, during its deliberations, the jury asked when a particular mugshot of Tarleton was taken, and it requested a sequential order of all photos of Tarleton. These questions, which suggest that the jury had some trouble identifying Tarleton as the robber, further emphasize the importance of the hearsay evidence to the outcome of the trial here.

For all these reasons, I think the state court made an unreasonable determination of the facts when it found that the State had "near overwhelming evidence"—even absent the hearsay evidence. Because the state court's decision is unreasonable under AEDPA, I would review Tarleton's *Strickland* claim *de novo*. *Daniel v. Comm'r, Ala. Dep't of Corr.*, 822 F.3d 1248, 1280 (11th Cir. 2016) (explaining that once we determine a state court decision is "unreasonable under § 2254(d), [then] we must review the merits of [a] claim *de novo*"). Under *de novo* review, I would find that counsel's errors here seriously undermine confidence in the outcome, and I would grant Tarleton's habeas petition.

## II.

I have substantial concerns about the outcome of Tarleton's trial, and I would grant the habeas petition. For these reasons, I respectfully dissent.

38